MARSHALL LITCHFIELD *vs.* INHABITANTS OF SCITUATE.

Plymouth.  Oct. 17, 1882. — Oct. 19, 1883.  C. ALLEN, COLBURN, & HOLMES, JJ., absent.

An order of the General Court of Plymouth, made in 1636, that the town of Scituate be allowed to dispose of the land beyond the North River, except that which was before disposed of to others, did not operate as a grant to the town of a tract of land beyond the North River, which the General Court had three years before ordered to be reserved until the resolution of certain persons named in respect thereto should be ascertained; nor as a grant of the sea-shore in front of the land reserved, although it was not included in the reservation.

A grant of land, made by Plymouth Colony to certain proprietors, defined the line between the proprietors and a town as beginning at high-water mark and running three miles inland into the woods. *Held*, that the starting point was for the purpose of defining the distance the grant extended inland, and had no reference to the question whether it extended to low-water mark.

An order of the General Court of Plymouth Colony in 1642-3, defining the bounds of the town of Scituate by a line up the Indian Head River to a pond, from thence to another pond, named, and from thence to the sea by a described line, did not convey the seashore between the side lines to the town.

In the absence of evidence that a regulation similar to the Massachusetts colonial ordinance of 1647 was in force in Plymouth Colony, or that a similar usage prevailed there, by which flats would pass as adjacent to upland, a grant of lands, bounding on the sea, by the Plymouth Colony, conveyed only the upland.

After the Province Charter took effect, the Massachusetts colonial ordinance of 1647 became law in the territory formerly part of Plymouth Colony; and by the effect of the ordinance the flats in front of land previously granted by the Colony enured to the benefit of the grantees, or those claiming under them, if the Colony had not conveyed the flats to others before the Province Charter.

A deed of land described as bounded by "the sea," or by "the harbor," conveys the shore below high-water mark; otherwise when the land is bounded by "the beach," unless this description is controlled by other parts of the deed.

The demandant in a writ of entry, against a tenant who has no title, may rely upon possession, and need not show title by grant or by disseisin of the true owner.

WRIT OF ENTRY, dated September 20, 1877, in two counts, to recover two parcels of land in Scituate, each consisting of upland and flats. Plea, *nul disseisin* as to the flats, and a disclaimer of title as to the upland. Trial in the Superior Court, before *Bacon*, J., who, after a verdict for the tenant on the question whether the demandant had acquired title by adverse possession, reported the case for the determination of this court. The facts appear in the opinion.

*W. Gaston & C. G. Davis*, (*P. Simmons* with them,) for the demandant.

*B. W. Harris & P. E. Tucker*, for the tenant.

FIELD, J. The tenant has disclaimed as to all the premises demanded above mean high-water mark, and only the title to the seashore below high-water mark is in dispute. It does not appear whether the sea at any point ebbs "above a hundred rods." Both parties claim title under the Colony of Plymouth, and the tenant does not deny the rightful power of the Colony to convey title to the shore of the sea. The premises demanded in the first count contain two parcels, which, so far as they border upon the sea, have come to the demandant from Ward Litchfield, and to him by two different lines of conveyances from Timothy Hatherly, and were a part of Hatherly's farm at Scituate Harbor, assigned to him in severalty by the Conahasset proprietors on March 1, 1649. These two parcels may be called the Tilden lot and the Cudworth lot. The premises demanded in the second count have, so far as they border upon the sea, come to the demandant from Charles Chauncey, in whose right, then held by the North Society, twenty acres of land were laid out by the Conahasset proprietors on October 17, 1695. All the premises are a part of the lands of the Conahasset proprietors, who derived their shares from Timothy Hatherly. The foundation of Hatherly's title is a grant from the Colony of Plymouth to himself and three associates. Hatherly became the owner of the shares of his associates, and then conveyed certain

shares to Charles Chauncey and twenty-six others, who, with him, constituted the Conahasset proprietors, holding the lands in common and undivided, until they were assigned or allotted in severalty.

On July 1, 1633, it was ordered by the General Court of New Plymouth, " that the whole tract of land between the brooke at Scituate, on the norwest side, and Conahasset be left undisposed of till we know the resolucõn of Mr. James Sherley, Mr. John Beauchamp, Mr. Rich. Andrews and Tymothy Hatherly, as also that porcõn of land lately made choice of by Mr. Hatherly aforesaid." 1 Plym. Col. Rec. 17. Under date of October 2, 1637, " It is enacted by the Court that the graunt of lands at Scituate, made to Mr. Tymothy Hatherly, Mr. Andrewes, Mr. Sherley & Mr. Beauchamp, shall extend three miles vp into the woods from the heigh water marke, prouided that vpon the view of Mr. Prince & Mr. Collyer, it doe not too much p̃judice the towne of Scituate." 1 Plym. Col. Rec. 130. Under date of March 6, 1637–8, this order was confirmed, as it was found that it would not much prejudice the town of Scituate. 1 Plym. Col. Rec. 147. No line appears to have been run at the time except the westerly line, the record of which appears in a note to the last order. The boundaries of these lands also appear in a deed of undivided parts or shares by Timothy Hatherly to Charles Chauncey and others, dated December 1, 1646, recorded on February 6, 1648, (12 Plym. Col. Rec. 258,) and in the report of a committee ordered by the Court of Plymouth, on March 8, 1682–3, to run the lines between the lands of the Cohasset proprietors and the lands of the town of Scituate. One of this committee at least, John Cushen, was the agent of the town of Scituate. A confirmatory deed to Mr. Hatherly and his associates, their heirs and assigns, was executed under the public seal of the Colony on March 5, 1685–6.* This deed confirmed the

---

* This deed, signed by Thomas Hinckley, Governor, and by Nathaniel Clarke, Secretary, was as follows:

" To all people to whom these presents shall come. Know ye that Whereas the Governor of the Colony of New Plymouth and his associates assembled in General Court in June Anno Domini one thousand six hundred and eighty and five did order and impower the Court of Magistrates in said Colony from time to time, at the request of any concerned to view and

grant to the "now true proprietors of said lands," "according to each proprietor's interest, just right, and proportion to and in the same, with all and singular the uplands, marshes, meadows, swamps, woods, waters, rivers, brooks, bays, ponds, coaves, creeks, etc." By the report of the committee it appears that the measurement began "at the brook of Scituate, about high-water mark," and the measurement was "three miles into the woods from the abovesaid brook at high-water mark." The lands of the Cohasset proprietors lay on the north, and the lands

---

examine any former grants of lands made by the Court to any Town, Society or particular person. And upon examination as aforesaid, to confirm and ratify such grant or grants by causing the public seal of the said Colony to be affixed to such their confirmation, as per said Court Records may appear.

" And Whereas, in the year one thousand six hundred thirty and three, Mr. William Bradford and his associates did reserve a tract of land at Coni-hasset so called for the use of Mr. James Shirly, Mr. John Beacham, Mr. Richard Andrews and Mr. Timothy Hatherly, and after said reservation did grant and confirm the said lands to the said Gentlemen and to their heirs and assigns forever, as per Court Records may appear.

" And Whereas the said Court of Magistrates in pursuance of said order having viewed and examined the Court Records concerning the said reserve and Grant, do therefore by these presents ratify establish and confirm the sd Grant to the now proprietors of sd lands who rightfully stand seized of and in the same in room and stead of the sd Mr. Shirly Mr. Beacham Mr. Andrews and Mr. Hatherly, either as heirs or assigns according to each proprietors interest just right and proportion to and in the same, with all and singular the uplands marshes meadows swamps woods waters Rivers Brooks bays ponds coaves creeks etc., being standing or growing on the said lands and premises with the rights privileges and appurtenances to the same belonging or in any wise appertaining.

" To have and to hold the said lands and premises with the appurtenances to the now true proprietors thereof deriving their title from the said Gentle-men, according to the said proprietors his respective interest in or unto the same, and to the heirs and assigns of such proprietor or proprietors forever. They and every of them yielding and paying to our Soveraigne Lord the King his heirs and successors, and to the President of the Honorable Councill for New England such part of the gold and silver oar as shall from time to time be found in the said lands, as in and by our original Charter or Patent is prescribed.

" In testimony whereof the said Court of Magistrates, by verty of said power committed to them have ordered the Publique seal of this Colony to be affixed to these presents this fifth day of March Ano 1685-6."

of the town of Scituate lay on the south of the line, "till the said line or range of marked trees meet with the said Scituate brook to the southeast, and be eastward of the first said white oak marked tree, on the said Buck's land, and then the said Scituate brook to be the bounds down stream to the outermost extent of said brook." A line was also run from a white-oak tree "at the uttermost extent of the said three miles into the woods," to Bound Brook, or Cohasset River, "and so on that point till it comes to the patent line," which was the westerly end of the Cohasset land. Both Cohasset River and Scituate Brook empty directly into arms of the sea.

The tenant claims title under an order of the General Court of Plymouth, of October 4 and 5, 1636, as follows: "That the towne of Scituate be allowed (viz. the purchasers & freemen) to dispose of the land beyond the North River, except that which was before disposed on to others. And also it be allowed them to make such orders in their towneship for their convenient & comfortable living as they shall finde necessary, provided they have, in case of justice, recourse unto Plymouth, as before." By a further order of the Court, on March 7, 1642–3, the bounds of the town were defined as follows: "It is ordered by the Court, that the bounds of Scittuate towneship, on the westerly side of the said towne, shall be up the Indian Head River to the pond which is the head of the said river, and from thence to Accord Pond, and from thence to the sea by the lyne that is the bound betwixt Massachusetts & Plymouth." By the general laws of the Colony, lands granted either to townships or to persons were to be held "according to the most free tenor of East Greenwich in the County of Kent in the Realm of England, granted unto us in our Charter or Patent." Plym. Col. Laws (ed. 1836) 279.

Scituate Brook lies north of North River, so that there is a line of coast between the streams and within the bounds of the town. A part of the northwesterly boundary of the land granted to Hatherly and his associates seems to have been the patent line, or the line "betwixt Massachusetts and Plymouth." The easterly boundary of the Hatherly land must have been the sea, either at high or low water. Whether there was a grant to Hatherly and his associates after the order of July 1, 1633, and

before that of October 2, 1637, which is now lost, or whether the lands between the brook at Scituate and Conahasset were regarded as reserved for Hatherly and his associates until " their resolučon " was known, is immaterial.  It is manifest from all the papers in the case, that the lands granted to Hatherly and his associates were not considered by the Colony or by the town as lands which the town could dispose of under the order of October 4, 5, 1636, and if the Colony did not actually grant them before October 4 and 5, 1636, it did soon after, as it had the right to do.  See *Lynn* v. *Nahant*, 113 Mass. 433.

The only dispute appears to have been about the boundary on the westerly or inland side.  The proceedings in regard to the Hatherly grant, taken after the order of October 4, 5, 1636, show the understanding of all parties at the time, and the construction put by them upon the grant.  The construction we put upon it is, that " the high-water mark " on the brook was taken as the starting point of the three miles into the woods, in order to determine the extent inland of the grant, and had no reference to the boundary of the grant on the sea.  As an exception or reservation out of the land which " the town of Scituate be allowed to dispose of " by the order of October 4, 5, 1636, whether the common law of England was in force in the Colony or not, the town would not have the right, under that order, to dispose of the seashore adjoining the uplands that were granted to Hatherly and his associates.  If that common law was in force, there is nothing in that order that conveys to the town, or gives the right to the town, to dispose of the seashore adjoining these uplands, or even the seashore adjoining the uplands which, under that order, the town might dispose of.  Under that law the seashore is not included in a grant of land bounded on the sea. By that law, the seashore can be granted by the sovereign power, but the grant must cover the seashore, either in express terms, or by necessary implication.  The order of March 7, 1642–3, defines the bounds of the town for the purpose of municipal jurisdiction.  It is not a grant of land, and, if it were, its terms are not such as to convey the seashore according to the common law of England.  Grants to towns are not construed more liberally in this respect than grants to persons.  *Commonwealth* v. *Roxbury*, 9 Gray, 451.  *Boston* v. *Richardson*, 105 Mass. 351.

If the provisions of the Massachusetts ordinance of 1647 be considered as a part of the common law of Plymouth Colony at this time, which was before the passage of that ordinance in Massachusetts, then the seashore " to the low-water mark, where the sea doth not ebb above a hundred rods," belonged to the owners of the adjoining uplands, unless by the construction of the grant the seashore was excluded ; and these owners in this case were Hatherly and his associates. Under either view, the tenant shows no title to the seashore by grant.

The evidence of use and occupation by or under the authority of the town was introduced by the tenant, as we understand, not for the purpose of showing title by adverse user in the town, but for the purpose of showing an interruption of the continuous adverse use and occupation which the demandant attempted to prove in order to establish a title by disseisin, if he failed to establish a title by grant.

There is no sufficient evidence known to the court that the common law of Plymouth Colony in 1633, or in 1636, was in respect to the rights of littoral proprietors to the seashore different from the common law of England. The note to *Commonwealth* v. *Roxbury*, 9 Gray, 516, by the reporter, suggests that perhaps there may have been a somewhat indefinite usage in Massachusetts before the passage of the ordinance of 1647, which that ordinance defined ; but the settlers of Plymouth Colony probably thought less about the peculiar title of the government to the seashore than the settlers of Massachusetts Bay, and it does not appear that in Plymouth the rights to the beach or shore were ever made the subject of legislation, or of adjudication by the courts, although that Colony early provided " that fowling, fishing, and hunting be free," and made regula- tions concerning the taking of whales that come on shore, con- cerning wrecks, and concerning the use of the shore on the Cape, outside town limits, for fishing. There is nothing known that indicates that the rights generally of the government or the pub- lic, and of the proprietors of uplands, in the adjoining seashore, were ever deliberately considered by the General Court, or by the inferior courts of that Colony. The papers in this case do not show that the grantor or the grantees had, when these grants were made, any such rights in mind, and made provision

for them. In this state of things we think it must be considered that the common law of England prevailed.

But the Massachusetts ordinance of 1647 has been extended to Plymouth, to Nantucket, to the county of Dukes County, and to Maine, and this has been done by usage and by judicial decision. The Province Charter confirmed the grants of land theretofore made, but it did not confirm the laws passed by the two Colonies. The Prov. St. of 1692 (4 W. & M.) c. 1, 1 Prov. Laws (State ed.) 27, entitled "An act for continuing the local laws, to stand in force till November 10th, 1692," and the Prov. St. of 1692 (4 W. & M.) c. 43, 1 Prov. Laws (State ed.) 99, reviving the former act, were both disallowed by the Privy Council. The effect of the judgment against the Massachusetts Charter, and of c. 6, art. 6, of the Constitution of Massachusetts, upon the continued force of the laws and ordinances of the Massachusetts Colony, is discussed in the note to *Commonwealth* v. *Roxbury*, 9 Gray, 517, 518. Whether the ordinance is a part of the statutory law or of the common law in the territory of the Massachusetts Colony, it is perhaps unnecessary to determine. It was never extended over Plymouth by any act of the General Court. It is, however, the law throughout the whole Commonwealth. In the territory of the Massachusetts Colony it has been considered the law continuously since its passage. There is no sufficient evidence that it was the law of Plymouth Colony before its union with Massachusetts under the Province Charter. There is no evidence that, after the Province Charter, the law in this respect was considered to be different in the territory of the Plymouth Colony from the law prevailing in the Massachusetts Colony. The question then is, What is the effect of this ordinance upon grants made in the Plymouth Colony, not only before the Province Charter, but before the passage of the ordinance?

In *Commonwealth* v. *Roxbury*, 9 Gray, 498, the court say: "It may be added in this connection, that if this grant preceded the Colony ordinance, when that ordinance did pass, it annexed the flats to the upland; if the town were then owners of any portion of the shore, it would have enured to their benefit; if it was held by private proprietors, either derivatively from the town, or by original direct grants from the colonial government, it would have enured to their benefit respectively." This has

been decided in the case of grants in *Tappan* v. *Burnham*, 8 Allen, 65, and in *Boston* v. *Richardson, ubi supra.* See *Lynn* v. *Nahant, ubi supra.*

In the case at bar, the flats not having been granted away by the Colony of Plymouth, unless indeed the confirmatory deed to the " now proprietors " under Hatherly and his associates be considered such a grant; the title to them remained in that Colony until the Province Charter, and by that Charter was vested in the Province. As the ordinance must be held to have been a rule of property throughout the whole Province, it may well be held that, when the Province Charter passed the seals, the ordinance annexed flats to uplands theretofore granted by the Plymouth Colony, provided that the terms of the grants were such as would have included the flats if the ordinance had been in force when the grants were made. The ordinance then enured to the benefit of whomsoever then held title to lands adjoining the sea, according to the construction that would be given to the grants under which he held, if the ordinance had been always in force. The difference in the retrospective operation of the ordinance in the territory of the two Colonies upon grants which under the ordinance would, and under the common law of England would not, convey the shore or flats, is this: in the Massachusetts Colony the ordinance enures to the benefit of the grantees, or of those claiming under them, if the Colony had not conveyed the shore or flats to others before the passage of the ordinance; in Plymouth Colony the ordinance enures to the benefit of the grantees, or of those claiming under them, if that Colony had not conveyed the shore or flats to others before the Province Charter. This rule is in accordance with principles already adopted by the court, and secures uniformity in the construction of grants throughout the Commonwealth.

Applying this rule to the facts, the grant to Hatherly and his associates having, as we think, the easterly boundary on the sea, conveyed the shore or flats, within the limits of the ordinance. Hatherly's grant to Chauncey and others of certain undivided shares, expressly describes the sea as the east border, and this conveyed the shore or flats. The assignment of the four hundred acres to Hatherly expressly describes " the harbor for the

south border and the sea for the east border," and this conveyed
the shore or flats. Whether this shore has been conveyed to
the demandant, so that it forms a part of the premises described
in the first count, depends upon the construction of the deeds
from Hatherly, and of the subsequent conveyances.

The allotment in the right of Charles Chauncey was made
after the Province Charter, and when the North Society held
the right. Whether the shore adjoining the land described in
the second count has been conveyed to the demandant depends
upon this allotment and the subsequent conveyances.

Under the view we have taken, the rulings of the presiding
justice, that by the grants made by the Plymouth Colony no
title passed to any person under whom the demandant claims,
and that the town of Scituate took title in the shore by the
original grant from the Colony, are erroneous.

It becomes necessary to examine the subsequent conveyances
under which the demandant claims, as he can prevail only upon
his own title or possession, and it is not enough to show that the
tenant has no title.

The cases on the construction of grants upon the sea, shore,
or beach are collected in the note to *Commonwealth* v. *Roxbury*,
9 Gray, 524, 525. See also *Niles* v. *Patch*, 13 Gray, 254; *Boston* v. *Richardson*, *ubi supra; Paine* v. *Woods*, 108 Mass. 160;
*Gerrish* v. *Gary*, 120 Mass. 132.

The two parcels which are included in the first count have
been called the Tilden lot and the Cudworth lot. The Tilden
lot was conveyed to Joseph Tilden by Timothy Hatherly, by
deed dated October 16, 1666. The boundaries are not such that
we can say that the deed conveyed the shore. One of the boundaries is "by the high beach," which, unless it is controlled by
other provisions in the deed, would exclude the shore below
high-water mark. The Cudworth lot was conveyed to Major
James Cudworth in 1660, by deed of Timothy Hatherly, but
there is no boundary in terms upon the sea, or shore, or beach,
and we cannot say that this deed conveyed the shore.

As to the premises demanded in the second count, the line of
the allotment in the right of Charles Chauncey runs "by the
beach," and there is an allowance for points of beach within the
lines. Apparently the beaches were not thought worth reckoning

in determining the measurement of land. It may be that the parties to the deed regarded the beaches as worthless, and that the grantors had no intention of reserving the beaches that were outside the boundary lines; but, as matter of law, we cannot say that this allotment conveyed the beaches outside the lines.

In the case of each parcel, some of the conveyances subsequent to these, and under which the demandant claims, are without either definite description or bound on the beach. We cannot say, as matter of law, that they conveyed the shore. A boundary on the beach is ordinarily held to exclude the shore, unless it is controlled by other parts of the deed. In many cases the whole contents of the deeds are not before us, and we have no means of applying any of the conveyances to the land when the boundaries are not distinctly upon the harbor or sea. We cannot say that the demandant shows title to the shore by grant.

The demandant's title to all the parcels came from Ward Litchfield, by deed of November 8, 1824, and by deed of February 16, 1826. Both deeds distinctly convey to low-water mark. It appears by the report that "the demandant further contended that, if the record title to the shore was not in Ward Litchfield at the time of said deeds to the demandant, title had been acquired by disseisin." As the court held "that the town of Scituate took title in the shore by the original grant from the Colony," it would be necessary for the demandant to prove a title by disseisin, if he proved none by grant. But we have held that the town took no title by grant, and therefore it is not necessary for the demandant to prove a title by disseisin of the true owner. *Hubbard* v. *Little*, 9 Cush. 475. *Thoreau* v. *Pallies*, 1 Allen, 425. *Currier* v. *Gale*, 9 Allen, 522. Whether the demandant does not show sufficient possession to enable him to maintain his writ against a tenant who has no title, was not considered by the Superior Court, and is not properly before us.

*New trial ordered.*