INHABITANTS OF IPSWICH vs. PROPRIETORS OF JEFFRIES NECK PASTURE & others.

CLINTON E. HOBBS vs. SAME.

Essex.   March 12, 13, 1914. — September 10, 1914.

Present: RUGG, C. J., HAMMOND, LORING, BRALEY, & CROSBY, JJ.

*Ipswich. Proprietors of Jeffries Neck Pasture. Adverse Possession. Estoppel. Words, "Commoners."*

In a suit in equity by the town of Ipswich against the Proprietors of Jeffries Neck Pasture, a corporation formally incorporated or reorganized under the statute now R. L. c. 123, and a certain grantee from that corporation, to set aside the deed to the defendant grantee as void under R. L. c. 123, § 14, because not authorized by a vote of two thirds in number of the right owners, a master found that the plaintiff, through a conveyance made to it in 1788 by the Commoners of Ipswich, was the present owner of certain undrawn rights, on which it should have been permitted to vote against the authorization of the deed, and that the defendant corporation had not acquired by ouster or adverse possession any title to such undrawn rights against the plaintiff. It appeared that there was no direct refusal by the defendant corporation to recognize the plaintiff as a right holder until ten years before the filing of the bill.  *Held*, that the relation of the defendant corporation to the owners of the rights, who were the owners in common of the land called the Jeffries Neck Pasture, if not that of a trustee to *cestuis que trust*, was akin to that relation, so that it would be difficult to infer from equivocal acts of the defendant corporation a purpose to violate the duties arising out of that relationship by disseising or ousting any of the right owners; and on the facts reported the findings of the master were sustained and the deed in question was set aside as not authorized by a vote of two thirds in number of the right owners.

In a suit in equity by the town of Ipswich against the Proprietors of Jeffries Neck Pasture and a certain grantee from that corporation, to set aside a deed against the authorization of which the plaintiff had not been permitted to vote as the holder of rights in the defendant corporation, it was found by the master that the plaintiff was the owner of the rights in question through a conveyance made to it in 1788 by the Commoners of Ipswich. It appeared that in 1723 the Commoners of Ipswich pleaded in an action brought by a certain person that they had no right in the common land left undisposed of. The facts reported by the master showed that this plea was not true, the Com-

moners of Ipswich, besides other grants of rights, having granted two rights to the defendant corporation in 1767 and another right later. *Held,* that the defendants were not in a position to assert that the plaintiff was estopped by the plea.

RUGG, C. J.   These are bills in equity * whereby the plaintiffs seek to set aside a deed made by the defendant corporation to the defendant Clark.   The Proprietors of Jeffries Neck Pasture (hereafter called the Proprietors) is a corporation existing at least since about 1713 and formally incorporated or reorganized in 1837 under Rev. Sts. c. 43, now R. L. c. 123, which provides for the incorporation of owners of common lands.   The plaintiff contends that it is the owner of rights in this corporation, and that the deed in question is void on the ground that its execution and delivery were not authorized by a vote of two thirds in number of the right owners as required by R. L. c. 123, § 14.   ·

The determination of the controversy upon these points involves an examination of the history of the defendant corporation.   Jeffries Neck Pasture is an outlying hill in the town of Ipswich containing about four hundred acres and used for many years as a pasture.   Before 1710 it belonged to the Commoners of Ipswich who owned other lands.   Between 1707 and 1710 other inhabitants of Ipswich were admitted as Commoners and an apportionment of the land was made, though not in equal proportions, among the old and new Commoners.   Rights uniformly described by numbers were established, as follows: two hundred and sixty-eight old rights, two hundred and twenty-four new rights, both relating to upland, and one hundred and eight old marsh rights and one hundred and eleven new marsh rights.   Originally these were represented by lots laid out in severalty and to

---

* The first filed in May, 1903, in the Superior Court and afterwards transferred to the Supreme Judicial Court, and the second filed in the last named court on May 20, 1903.   A master found that the proceedings purporting to authorize the defendant corporation to convey its real estate to the defendant Clark were void.   The defendant denied that the plaintiff town had any title to rights in the defendant corporation, and at the meeting of the right holders of the defendant corporation the plaintiff town was not allowed to vote.   The master found that the town was the owner of a certain number of the rights and that less than two thirds of the known right holders voted for the sale.   Both cases were reserved by *De Courcy,* J., for determination by the full court.

some extent marked on the ground, but whatever ownership or occupation in severalty existed was slight and disappeared long ago and the right owners have conducted themselves for nearly or quite two hundred years as tenants in common and should be so considered.   See *Proprietors of Jeffries Neck Pasture* v. *Ipswich*, 153 Mass. 42.   In 1710 a list of owners was made with the numbers of the lots affixed to the names.   Other lists were made in 1713, two lists in 1748-9, and one in 1837, and another by the last "pounder" or keeper of the pasture.   In all the lists there are certain rights marked "undrawn."   While these undrawn rights are not identical in all the lists, the master has found that there are eleven old and eighteen new rights, which are undrawn and which are equal to nineteen and sixty-four one hundredths rights out of a total of four hundred and twenty-four and forty-eight one hundredths when approximately all the rights have been reduced to terms of old rights for convenience of description.   A pivotal question is the present ownership of these undrawn rights.   The master * has found that it is in the plaintiff through a conveyance made to it by the Commoners in 1788.   The defendant corporation claims title by adverse possession.

The salient facts upon which rests the decision of this question are these: It does not appear that either the plaintiff or its predecessor, the Commoners, actually enjoyed pasturage by virtue of undrawn rights.   In 1723 the Commoners pleaded in an action brought by one Samuel Tilton that they had no rights in common land left undisposed of.   The facts show that this plea was not true, and the defendants are not in a position to claim an estoppel by reason of the plea.   Assuming that their votes to that end were effective, the Commoners granted two undrawn rights to two different persons in 1722 and two other such rights in 1770, the Proprietors two in 1767 and later another after conference with the Commoners' clerk to ascertain whether the grantee was entitled thereto.   There was discussion from time to time touching the rights of Commoners and later of the plaintiff in the undrawn rights.   The Proprietors paid obligations to its clerk and employees in pasturage, but it never was expressed to be in respect of undrawn rights and there was no relation between the value of

* Wilbur E. Rowell, Esquire.

the undrawn rights and the pasturage given for the service or debt.

"Commoners" as that word generally is used in the real estate law of the colonial and provincial history of this Commonwealth, describes those who owned undivided tracts of land as tenants in common by virtue of a grant from the government to several persons usually for purposes of settlement and the establishment of a town. *Higbee* v. *Rice,* 5 Mass. 344. *Attorney General* v. *Tarr,* 148 Mass. 309, 311. From early times they have been enabled to act as a corporation. But, as was said in *Proprietors of Monumoi Great Beach* v. *Rogers,* 1 Mass. 159, at page 164, "This is a species of corporation different from corporations in general. . . . The statutes take away no rights from the individuals composing such a corporation, which, as tenants in common, they had before they were incorporated, but, on the contrary, give them new powers. . . . Whenever individuals are seised, as tenants in common, in their own several rights, they are, in the manner pointed out by law, authorized to incorporate for the purposes and with the powers expressed in the statutes; and are, by such an incorporation, seised as a corporation; and that without any corporate act done." The relation between the owners of the land held in common and the corporation established by them is peculiar. The parties do not act at arms length and independent of each other. On the contrary, the owners continue in many respects to be tenants in common as to the land, while the corporation exists for the benefit of all and cannot act adversely to any of those tenants without violation of its duty to protect the interests of all.

Plainly at the beginning in 1710 and 1713 the ownership of the undrawn lots was in the Commoners. They were not granted then to the corporation known as the Proprietors. This is the starting point. There is no grant nor vote to convey to the Proprietors at any time subsequent. On the contrary, there is evidence of assumption of continued ownership by the Commoners. The votes to convey rights by the Commoners in 1722 and 1770 at least were evidence and perhaps "sufficient proof of title and seisin" and raised a presumption of sufficient seisin in the Commoners to enable them to convey and vest title in the grantee. *Gloucester* v. *Gaffney,* 8 Allen, 11, 13. It is argued by the defendants that

the Proprietors had no other source except the undrawn rights from which to make its grants in 1767 and to make payments to its clerk and employees.   While it does not appear whence the authority to make these concessions was derived, conceivably it may have come from the temporary use of the numerous rights whose ownership has been lost sight of.   At all events it is not a necessary conclusion that it arose from disseisin by the corporation of the rights of the Commoners and its successor, the plaintiff.   The master has found that neither the Commoners nor the plaintiff nor the Proprietors have enjoyed pasturage of the undrawn rights at any time.   While the plaintiff and Commoners have never had actual possession in the sense of receipt of rents or profits from the land by virtue of the rights or the exercise of powers of ownership such as voting, neither have the Proprietors had similar possession, and its possession of the land has been by virtue of other rights which it was bound to exercise for the benefit of all owners.

The record fails to disclose any positive act by the Proprietors which constitutes either ouster of the Commoners or the plaintiff or active possession of their rights.   It is to be noted that the Proprietors as a corporation did not have independent title to the land.   The corporation had seisin simply for the mutual advantages of all the tenants in common.   For these reasons its conduct in respect of acquiring title by adverse possession or ousting the right owners stands on a less favorable footing than does that of tenants in common.   Yet it is the general rule that possession of one tenant in common of the common estate is not adverse to his cotenants but is consistent with their title.   An act to amount to dispossession or ouster must be decisive and unequivocal and evince a settled purpose to exclude the cotenant from all enjoyment of his title.   Facts sufficient to show such a purpose will vary with each case and no universal test can be formulated.   *Lefavour* v. *Homan,* 3 Allen, 354.   *Bellis* v. *Bellis,* 122 Mass. 414.   *Ingalls* v. *Newhall,* 139 Mass. 268.   *Parker* v. *Proprietors of Locks & Canals,* 3 Met. 91, 99.

*Springfield* v. *Miller,* 12 Mass. 415, on which the defendants strongly rely, is distinguishable on the ground that there was an initial grant by the Commoners of an entire tract to the Proprietors.   In the case at bar the Commoners made no grant

until that to the plaintiff in 1788. *Rickard* v. *Rickard,* 13 Pick. 251, and other like cases on which the defendants depend were cases involving rights of tenants in common and had nothing to do with a corporation. of Commoners or Proprietors.

The most significant circumstance in the case at bar is that from the time of the grant by the Commoners to the plaintiff in 1788 until 1893 there was no definite and positive demand by the plaintiff in assertion of its rights. But there was not until 1893 any direct refusal by the Proprietors to recognize the plaintiff as a right owner. From time to time the plaintiff took action looking toward an investigation and assertion of its rights. The relation of the corporation known as the Proprietors to the owners in common of the land, if not that of trustee to *cestuis que trust,* is akin to that relation and it is difficult to infer from equivocal acts a purpose to violate the duties arising out of that relationship and to disseise or oust the right owner. There was no positive denial by the Proprietors of the rights of the plaintiff until 1893. There has not been time since then for adverse possession to ripen into title. In view of all these peculiar circumstances we think that the facts do not require a finding of ouster or adverse possession by the defendant corporation and that the finding of the master that the plaintiff is still a right owner was correct.

The result follows from this conclusion that the vote to sell adopted in 1896, under the authority of which the deed from the Proprietors to the defendant Clark was executed, was not passed by the votes of two thirds in number of the right owners in the Proprietors, and hence that the deed under which the defendant Clark claims was void.

It would seem also that the same consequence must ensue from the finding of the master that sixty-one and forty-three one hundredths rights (some of these being marsh rights more divided in number and possibility of ownership) out of the total of four hundred and twenty-four and forty-eight one hundredths rights have been lost sight of and the owners are unknown. Certainly facts enough are not reported respecting these rights to warrant the inference that the title to them has been acquired through ouster or adverse possession by the Proprietors.

As the deed from the Proprietors to the defendant Clark was not merely voidable but void at its inception, because not author-

ized by such a vote of the members of the defendant corporation as is required by the statute, no question of laches arises. It is not contended that the plaintiffs' right to maintain the bill is barred by the statute of limitations.

The plaintiffs are entitled to a decree setting aside the deed as a nullity and awarding them costs.

*Ordered accordingly.*

*C. A. Sayward,* for the defendants.

*H. I. Bartlett,* (*G. H. W. Hayes* & *G. A. Schofield* with him,) for the plaintiff town.

*H. H. Newton,* for the plaintiff Hobbs.