ALMA L. BATES & another *vs.* TOWN OF COHASSET & others.

TOWN OF COHASSET *vs.* ALMA L. BATES & others.

Norfolk.    April 4, 5, 1932. — August 24, 1932.

Present: RUGG, C.J., CROSBY, WAIT, & DONAHUE, JJ.

*Proprietors of Common Lands of Hingham. Cohasset. Way,* Public. *Grant. Municipal Corporations. Adverse Possession. Evidence,* Presumptions and burden of proof, Public record, Declaration of deceased person. *Land Court,* Findings by judge, Requests and rulings, Exceptions.

The act of the General Court of the Massachusetts Bay Colony in May, 1640, that certain land "at Conihasset . . . [Cohasset, then a part of Hingham] shalbee confered upon Hingham" and that certain commissioners "shall have power to dispose thereof to the inhabitants there," was a grant, not to the town of Hingham in its corporate capacity, but to the individual inhabitants of Hingham as tenants in common.

In proceedings in the Land Court for registration of title to land in Cohasset, including a strip of land lying between the travelled portion of Jerusalem Road on the east and a house lot of one of the parties on the west, it appeared that the strip had been a part of the lands held by the proprietors of common lands of Hingham; that Cohasset, previously a part of Hingham, became a separate town in 1775; and that in 1788 the proprietors, having finished the division of the common and undivided lands, voted to accept a committee report that "all the proprietors' ways and undivided lands be given up to the town for their use and benefit forever on" certain conditions. The trial judge found that the strip was not included in the proprietors' divisions, and that it was not a part of Jerusalem Road, which had been laid out as such and later relocated. *Held,* that

(1) On the record, the findings by the trial judge were not to be reversed;

(2) The action of the proprietors in 1788 was a grant of the proprietors' ways and undivided lands to the town of Cohasset;

(3) Nothing appearing to the contrary, acceptance of the grant by the town of Cohasset was to be presumed;

(4) Record title to the strip was in the town of Cohasset.

Evidence in the proceedings above described, that a party, who owned land to the west of the strip in question, and his predecessors in title, had maintained the strip as a lawn, had kept it mowed and watered from a sprinkler attached to their water pipe running through it, had maintained a pergola thereon and had set out flowers and shrubs

therein; that at times they excluded persons from crossing the strip; that the only well to the house was on the strip and was also used by others; that gravel had been removed from the strip by the town with the consent of one of said predecessors in title; and that the strip always had remained open and unenclosed, warranted a finding by the trial judge that the owner of the house had not acquired title to the strip by adverse possession.

A conclusion, that title to the strip of land above described was in the town, was proper.

Even if the admission in evidence of a certificate by the assessors of a municipality, to the effect that there was no record of the assessment of a certain parcel of land, was not authorized by G. L. c. 233, § 76, an exception to its admission must be overruled where it appeared that a letter to the same effect from the assistant clerk of the board of selectmen was admitted without objection by the excepting party.

An exception, to the admission in evidence of a relevant and material statement by a deceased person, will not be sustained where the record before this court does not show that the preliminary inquiry and findings required by G. L. c. 233, § 65, were not made by the trial judge.

The granting by a judge of the Land Court of certain requests for rulings of law was *held*, on the record, not to have been intended by him to change certain decisive findings stated by him in his decision.

An exception to the refusal of a request for ruling is not to be sustained for the reason that the trial judge did not understand the request as the party submitting it intended it to be understood: such party must state the request in such a way that it will not be misunderstood if he wishes to base any rights on it.

Two PETITIONS, filed in the Land Court on November 12, 1926, and June 8, 1929, respectively, for registration of the title to land in Cohasset.

The petitions were heard together by *Davis*, J. The rough diagram on page 144 appeared in the bill of exceptions filed by some of the parties.

The first petition concerned land shown on the diagram as parcels BII and AI(b). The second petition concerned the land shown on the diagram as parcels AI(a) and AI(b). Material evidence, findings and rulings by the judge and exceptions saved are described in the opinion. In his decision, the judge ordered the entry in the first case of a decree for the petitioners "as far easterly as the westerly line of the locus"; and ordered the entry in the second case of a decree for the petitioner "subject to the town and county roads and water pipe and other rights thereover." Some of the parties alleged exceptions in both cases.

*W. H. Brown,* (*J. F. Burke* with him,) for Bates and another.

*F. A. Thayer,* Town Counsel, for town of Cohasset.

*W. Noyes,* (*D. Wight* with him,) for Wight and others.

BY THE COURT. The subjoined opinion was prepared by Mr. Justice Sanderson, and was adopted after his death as the opinion of the court.

These are two petitions for registration of title to real estate in the town of Cohasset. The Bates petitioners sought

to register title to the locus in dispute, and a petition was filed by the town in which the Wights and Barnes *et al.·* are respondents to register title to the locus in dispute and also other land to the south of that locus. The Bates petitioners will be referred to as the petitioners, and the town of Cohasset, and the Wights and Barnes *et al.*, the individual respondents, will be referred to as the respondents unless otherwise designated. Cyrus H. Bates has died since the filing of the petition, but the remaining petitioners inherited his share of the land in question.

The locus principally contended for by the petitioners is bounded on the north by a stone wall on the line of the Wight property, on the east by Jerusalem Road, on the south by land assigned to the town and not disputed, and on the west by the east bound of the old town road. The locus, together with the town's land, forms a triangle to the south of the Wight land, bounded on two sides by Jerusalem Road and the old road. The general location of this triangle is to the south of a region known as "Steep Rocks." It appears from the Land Court decision that the petitioners' house lot came out of the second division of Cohasset lands. Land of the respondent Barnes is at what was once Pye Corner, where an ancient way, later discontinued, ran between the first and second division lots. The divisions referred to have the following origin. In May, 1640, the General Court of the Massachusetts Bay Colony voted (1 Mass. Col. Rec. 290): "It is ordered, that such land & medowe at Conihasset as shall fall w$^{th}$in this iurisdiction shalbee confered upon Hingham, & that M$^r$ Duncan, M$^r$ Glover, Willi: Heathe, & Willi: Parke, or any three of them, shall have power to dispose thereof to the inhabitants there . . . ." Thirty years later the following vote is recorded: " . . . upon the seventeenth day of January one thousand six hundred sixty and nine att a Legall meeting of the proprietors of the sayd Common lands of Hingham generally fully freely and absolutely agreed Concluded and determined . . . that their Comon lands shall be Cast into 700 Shares in Deviding to every one of themselves to possesse and injoy to themselves and their heirs & assigns for ever as followeth . . . ." (A list of one hundred names follows.) At a town meeting on November 25, 1670, the inhabitants voted to have Lieutenant Joshua Fisher survey their commons and lay out the lots, and the boundaries of the first division were established. On December 5 of the same year those of the second division were voted. Another important division was that of the second part of the sixth division voted by the proprietors of the common lands in May, 1744.

The decision of the Land Court is in part in the following terms: "These two cases were tried together. The land in

dispute is a parcel of land lying between the westerly edge of
the travelled way of Jerusalem Road and the petitioners'
house in Cohasset. From just south of the tract in dispute
Jerusalem Road as travelled slopes down to the north, and
from Jerusalem Road to the east the land drops sharply to
the salt meadow. From the point at which Jerusalem Road,
as travelled, begins to slope downward to the north a way
runs northerly, near the westerly line of the tract in dispute,
affording access to the old Nichols's place, now the property
of the respondent Wight adjoining on the north the house lot
of the petitioners, and adjoining land at the south formerly
a part of the Wheelwright estate. It is the contention of the
petitioners that their house lot extended easterly to the west-
erly line of Jerusalem Road as now travelled, thereby includ-
ing the tract in dispute which is covered by the description
in their petition for registration of title, or if not, that they
have title to it acquired by adverse possession. It is the
contention of the respondents that title to the tract in dispute
is in the town, as a part of the location of Jerusalem Road,
as common land left undivided by the proprietors, and as
originally granted to the town and never alienated by it.
It is, therefore, included in the cross petition for registration
of title filed by the town. Examination of the early history
of the title resulted in complete divergence of opinion between
the parties, as regards both history and law. It has resulted
also in an immense expenditure of time and labor in research
and in the submission of hundreds of exhibits and elaborate
arguments in support of their several contentions. Each side
has made many objections to exhibits offered by the other,
so that a short review of the matter of ancient grants becomes
necessary. It is contended on behalf of the town that the
grant of May, 1640, was a grant to the town in its corporate
capacity. Cohasset was then a part of Hingham. Hingham
was settled about 1633. In 1635 its name was changed from
Bare Cove to Hingham. 1 Mass. Col. Rec. 156. In 1640
(*Ibid.* 290) it was ordered by the General Court that land
and meadow at Conihasset shall be conferred upon Hing-
ham, and that certain commissioners have power to dispose
thereof to the inhabitants according to their number of

persons and estates, for the most benefit of the town, having
consideration of such quantities of land and meadow as
have been formerly allotted to the said inhabitants. It is
argued that this constituted a grant to the town in its cor-
porate capacity. This seems to have been the view of the
examiner in his report in case . . . [of the town petitioner].
I am unable to agree. It appears from the order of 1640
that there had been previous allotments to the inhabitants.
Such allotments and ancient grants were to the inhabitants
as individuals, being tenants in common . . . . Meetings
of the communities of the early settlers, in all of the differ-
ent phases of community life, for religious purposes, for
military defence, for the division of lands, for the use of
common fields, for school purposes, and otherwise, were all
held in the meeting house, and the records were all kept in
one book. Eventually many of these phases of community
life became established as separate organizations under
corporate or *quasi* corporate forms, and regulated by stat-
ute . . . . The proprietors of common lands were early
established as such a *quasi* corporate body for the purpose
of division. The nature of the title held by the commoners,
and the rights of the organization of proprietors are con-
sidered in *Ipswich* v. *Proprietors of Jeffries Neck Pasture,*
218 Mass. 487."

The limited corporate characteristics possessed by early
towns tend to make it improbable that grants in 1640 were
intended to be to the municipality. *Rehoboth* v. *Hunt,*
1 Pick. 224. *Porter* v. *Sullivan,* 7 Gray, 441, 444. *Com-
monwealth* v. *Roxbury,* 9 Gray, 451, 495, 500. The grants
later made of this land apparently were made by its pro-
prietors. We find no error in the conclusion of the judge
of the Land Court that the act of the General Court in
1640 conferring upon Hingham land and meadow in Coni-
hasset and giving commissioners power to dispose of them
to the inhabitants according to their number of persons and
estate was a grant not to the town in its corporate capacity,
but to the inhabitants as individuals to hold as tenants in
common. The form of the act, as well as subsequent
events, would seem to support the theory that the land in

question should be within the territorial limits of the town of Hingham rather than that the title to it should be in Hingham as a municipal corporation.   In *Porter* v. *Sullivan,* 7 Gray, 441, 443, the court said: "All the lands were first granted by the crown to the Governor and Company of the Massachusetts Bay in New England, and by them were parcelled out to individuals, and, at a later period, to bodies of proprietors, as tenants in common." In *Rehoboth* v. *Hunt,* 1 Pick. 224, 228, the court said: "The title to the township was, by the ancient conveyances, in sundry persons, not as a corporation, but as individuals, being tenants in common; for although they are mentioned in some of the ancient conveyances as townsmen, or as inhabitants of Rehoboth, this is only by way of description, and not as designating the capacity in which they are to take."

One of the contentions of the petitioners, as stated by the judge of the Land Court, was that the tract in dispute was included in the divisions made by the proprietors of their lands with a reservation of a right to locate the highways over it.   The respondents contend that the whole of the disputed locus is a part of Jerusalem Road.   The petitioners contend that the westerly line of that road is the westerly line of the road as used and that their land bounds on this road.   The judge of the Land Court states: "I have gone carefully through the great mass of ancient records, grants and plans that have been submitted in these cases.   I find that the land in controversy was not included in the proprietors' divisions.   This appears both from the divisions themselves and from the plans thereof. The vote of 1678 to sell all the wood and timber on the highway running along between the salt meadow and the lots of the second division until it comes to Pye Corner is significant.   The petitioners' house lot comes out of the second division.   Land of the respondent Barnes to the south was at Pye Corner where an ancient way, later discontinued, ran to the west.   The petitioners show no record title under the sixth division, into which the tract in dispute fell if that division did, as I find that it did not, include this tract.   It is argued that the entire tract . . .

which is in dispute constitutes a part of Jerusalem Road.
I do not agree. Because of the Steep Rocks the original
road ran along the westerly side of this tract, and thence
up over the rocks to the north. As soon as circumstances
permitted, and in the early part of the eighteenth century
although the exact date is in doubt, a way was constructed
around the foot of Steep Rocks, which is now Jerusalem
Road. Thereafter the old way was discontinued northerly
from the southerly line of the land now of the respondent
Wight. As far as the Wight land, however, it remained in
use."

Whatever its history before 1738–1739 may have been,
Jerusalem Road was in that year laid out as a road four
rods wide. It was relocated in 1867, forty-five feet wide
"on the lines of the existing walls and fences . . . [which
were] represented by black lines on the Plan, except, as
hereinafter specified . . . said new lines being designated
by red lines." On the plan there were no red lines and no
changes indicated at the point in question. In 1901 the
road was again relocated, but no change was made in it
where it adjoins the disputed locus. We have examined
the record and find that no sufficient reason has been shown
for reversing the finding of the judge of the Land Court to
the effect that the disputed locus is not a part of Jerusalem
Road and that the locus was not included in any of the
divisions of the proprietors.

The petitioners contend that the court erred in reaching
the conclusion that the act of the proprietors in 1788 passed
to Cohasset title to common and undivided land held by
them within the limits of that town. The decision of the
Land Court on this matter is in the following terms: "In
1770 Cohasset was separated from Hingham, and in 1775
became a town. In 1788 the proprietors of Hingham,
having finished the division of the common and undivided
lands, voted to accept a committee report that 'all the
proprietors' ways and undivided lands be given up to the
town for their use and benefit forever on the conditions
following' that certain highways in Hingham as therein
described be laid out and that the town accept the above

roads and all the proprietors' ways and repair them as other public roads if necessary. The town of Hingham voted at a town meeting held on the first Monday of April, 1788, 'to accept of the proprietors' ways and of the proprietors' lands not before disposed of at which they at a meeting of their's this present day made a grant of to the town of Hingham.' It is argued by the petitioners that the action of the proprietors in 1788 was a mere acceptance of a committee report and did not constitute a grant. I rule that it did constitute a grant. The petitioners say, however, that it did not constitute a grant to the town of Cohasset. I think that it did. There was only one organization of proprietors. That organization was formed for the purpose of dividing the common lands and, that having been accomplished, of passing out of existence. Title to the common lands was not in the corporation. The corporate organization was created solely for the convenience of the tenants in common in the management and division of their lands. When that was accomplished the corporation was, as was said in *Proprietors of Monumoi Great Beach* v. *Rogers*, 1 Mass. 159, 164, 'intended to *die.*' Under the provisions of St. 1783, c. 39, the records after the final and total division of the land were to be lodged with the clerk of the town. Under the provisions of St. 1790, c. 40, the proprietors shall not continue to act in their corporate capacity for more than ten years after the final division of their lands. In 1788 the proprietors had made final division of all lands suitable therefor, but having reserved certain strips, among them that now in dispute, over which roads were to be constructed. They then voted that all the proprietors' ways and undivided lands be given up to the town. I think that this meant, and can only mean, to the town in which the lands were situated. If the conveyance had been prior to the separation of the towns, title on such separation would have passed to Cohasset . . . . Land in Cohasset could not be conveyed to Hingham to be held for public purposes, in distinction from land held by the municipality in its private and corporate capacity. Title within the limits of a town to lands never

granted either to the town or to any individuals is held by the town by virtue of its establishment and existence as a municipal corporation, for public uses with power by vote of the freemen to divide them . . . . Title to the disputed tract in the case at bar was in the proprietors, reserved for public purposes. It was the duty of the proprietors' organization, having finished a division of all lands suitable for allotment, to transfer to the proper town parcels held for road and other public purposes. This, which was their duty, was also the intent of their action in 1788. The petitioners say that there is no acceptance by the town of Cohasset. I think such acceptance must be presumed. The roads have been constructed and maintained."

We are of opinion that although the town of Cohasset was not mentioned by name in the vote the trial judge was right in holding that when the proprietors gave up to the town "all the proprietors' ways and undivided lands" the title to such ways and lands as were in Hingham went to Hingham and the title to such as were in Cohasset went to Cohasset, and also in holding that nothing appearing to the contrary acceptance would be presumed. The proprietors had been proprietors of common lands in Hingham when Cohasset became a separate town. They continued to hold title to the land in both towns. They would naturally refer to themselves as proprietors of the common lands of Hingham. But when their work of division came to an end they could not convey to Hingham the part remaining within the limits of Cohasset. Their purpose evidently was to bring their work to an end and the appropriate way to do it was to convey the land in each town to the town in which it lay. In *Easton* v. *Drake*, 182 Mass. 283, 285, the court said: "Liberal rules are to be applied in the construction of such ancient grants, in order to carry out the intention of the parties."

The petitioners have also contended that they gained title to the locus in dispute by absorption and by adverse possession. The findings of the Land Court on these questions are in the following terms: "It is the contention of the petitioners that title to the parcel in dispute remained in the proprietors as tenants in common until it became absorbed in the

titles of the abutting owners. I know of no such method of acquirement of title. If title did remain in the proprietors, then, the land not having been set off or granted to any individual, but being held for public purposes, the title would vest in the town 'by virtue of its establishment and existence as a municipal corporation.' In *Cohasset* v. *Moors*, 204 Mass. 173, as in the case at bar, record title was reported by the examiner to be in the town, and so assumed by the court. The points now taken by counsel for the petitioners were not raised. The petitioner [respondent?] there claimed title acquired as against the town by adverse possession through enclosure and exclusive occupation. I so found, and the finding was sustained. In the instant case the petitioners also claim title by adverse possession. Since 1870 deeds in the petitioners' chain of title have covered the northerly part of the tract in dispute. There is a deed of a one acre lot which the petitioners, and the examiner also, have assumed was a part of this tract. I find, however, that this was to the north, and is a portion of the respondent Wight land. The petitioners and their predecessors have set out shrubs and flowers on the disputed tract and maintained a pergola on it, have mowed it and for a number of years have kept it as a lawn, have had a sprinkler attached to their water pipe which runs through it, and used the sprinkler for the preservation of the lawn, and have at times excluded boys and others from crossing it. The petitioners' house was built in 1734, and the only well to the house was on the disputed tract. On the other hand there is testimony that the well was used by neighbors and others than the petitioners. In 1865 the respondents' [petitioners'?] predecessor, Bates, had negotiations with the town with regard to the removal of a gravel knoll on the disputed tract, as a result of which the knoll was removed by the town under an agreement with Bates. I do not find, however, that the gravel was sold to the town by Bates. I find record title in the town, and I do not find title in the petitioners acquired as against the town by adverse possession. There has undoubtedly been an assertion of ownership since 1870 on the part of the petitioners and their predecessors, but the tract has remained open and unen-

closed, with Jerusalem Road along its easterly side, and the old road along its westerly side extending northerly to land of the respondent Wight. The care taken of the space between by the petitioners was not such as would result in the acquisition of title in them by adverse possession . . . . The southerly portion of the tract covered by the petition of the town . . . is south of the Bates land, and opposite that of the respondent Barnes who makes no objection. Over this tract, however, are the two public ways, one, Jerusalem Road which is now a county way, and the other the old town way along the westerly side. There is also on the ground a travelled way curving from Jerusalem Road to the old town road across the middle of the tract, and near its northwesterly corner, a turn-around. There is no layout of these last travelled ways however. They merely show a user, apparently permissive, under which I find no rights adverse to the town. There are also water pipes across this tract from the main in Jerusalem Road to the abutting premises, and I find the title subject to the right to their maintenance. It is to be noted, that there is a distinction between land held by a town for park purposes and land held for road purposes, but not needed therefor. On the whole evidence in this case I am constrained to find title to the tract covered by the petition . . . [of the town] to be in the town."

The question whether the petitioners have gained title by adverse possession is one of fact. The conclusion of fact that such title has not been gained is decisive unless the subsidiary findings control it. The petitioners have never fenced the land they claim to own by adverse possession and it might not be evident that the purpose of the petitioners in doing some of the acts done by them upon the land was to assert a claim of ownership. The fact that the town took gravel from the land in dispute with the consent of the petitioners' predecessor in title, while significant, is not conclusive of the rights of the parties in the disputed locus. We cannot say that as matter of law the trial judge was clearly wrong in reaching the conclusion that no title had been gained by the petitioners by adverse possession and that the title to the disputed tract is in the town.

The petitioners saved exceptions numbered 1, 3, 4, 11, 12, 13, 15, 23 and 29 to the admission in evidence of certain documents and plans, and to the admission in evidence of two titles except for the purpose of showing the relative position of property in the neighborhood. Exception numbered 12 relates to the admission in evidence of a certificate of the assessors of the town of Cohasset containing the statement: "There is no record of the assessment of the above parcel of land to any person prior to 1923." There is no contention by the petitioners that the land was assessed to the petitioners' predecessor in title or to any one else before 1923. In that year it was assessed and the tax abated the same year because of an illegal assessment. G. L. c. 233, § 76, seems to authorize assessors to make a certificate of what is on their official records rather than of what is not there.

It seems, however, that a letter identified as Exhibit A VIII (c) went in without objection by the petitioners. This was a letter from an assistant clerk of the board of selectmen and stated that there was no record of assessment of the land in dispute. In these circumstances we think there was no prejudicial error in admitting in evidence the certificate of the assessors.

Exception numbered 23 relates to the introduction in evidence of an exhibit purporting to be signed by John H. Cook, not living at the time of trial, stating, in substance, that he had lived in the neighborhood since about 1832 and that the locus in dispute was always known as common land and that the well on the land was used by the owners of all the land adjoining. This statement was sworn to before Mr. Wight, a justice of the peace, who produced it at the trial. It does not clearly appear from the record what evidence was introduced in connection with this affidavit. The statement of Cook would be competent if there was evidence to show that he stated the facts of his own personal knowledge. This court has held that an exception will not be sustained to the admission in evidence of the statement of a deceased witness if the record does not show that no preliminary inquiry and finding were made by the trial judge.

*Newton Centre Trust Co.* v. *Stuart*, 208 Mass. 221. *Murphy* v. *Hanright*, 238 Mass. 200.

We have considered all the exceptions in this group and are of opinion that the petitioners have not been prejudiced in any of their essential rights by the admission in evidence of any of the exhibits or plans or by the use which appears to have been made of the evidence showing the chain of title of neighboring estates. See *Drury* v. *Midland Railroad*, 127 Mass. 571, 581; *Weld* v. *Brooks*, 152 Mass. 297. 304; *Whitman* v. *Shaw*, 166 Mass. 451.

.We have found no sufficient reason to modify or reverse the findings of fact to which the petitioners have objected. The whole evidence is not reported. The findings of fact by a judge of the Land Court will not be disturbed unless unsupported by the evidence. *Mahoney* v. *Wilson*, 260 Mass. 412.

The respondents excepted to the granting of the petitioners' requests for rulings numbered 3, 4 and 5: (3) "By the early vote of the town of Hingham on January 17, 1669, the town voted that their common lands (which included the locus) should be cast into seven hundred shares in dividing, and every one of themselves to possess and enjoy to themselves and their heirs and assigns forever as follows, and then proceeded to draw the several shares in the names of the different inhabitants of the town, giving to each his shares 'to him and his heirs and assigns forever.' This vote and drawings disposed of all the common lands of Hingham, including the Cohasset lands not previously divided, and each shareholder held an undivided interest in these common lands, which passed to him and his heirs and assigns forever, and the town as a corporation no longer had any rights or interest in these common lands, thereafter they belonged to the shareholders"; (4) "Subsequent early votes of 1669 and 1670 of the proprietors of the common lands in Hingham (which included the locus) divided the common lands into parcels, which were distributed among the original seven hundred shareholders except lands reserved for highways"; (5) "The town of Hingham no longer held any interest in the aforesaid lands, including the locus, when

Cohasset was set off from Hingham, about 1770." The form in which these requests were made and granted cannot have been intended to change the definite findings in the decision to the effect that the act of 1640 did not vest title to the land granted in the town of Hingham, or to the effect that the title to the locus in dispute was not conveyed to any one, or to the effect that it remained a part of the common lands.

The respondents contend that the judge of the Land Court erred in refusing to rule, in effect, that recitals in ancient deeds and plans when produced from proper custody and material are presumed to be true. It is evident from the statement of the judge that his refusal to grant the requests under consideration was solely because he was of opinion that such recitals did not create a conclusive presumption. Even if he did not understand requests numbered 22, 44 and 46 as the respondents intended them to be understood, the exceptions should not be sustained for this reason. The excepting party must state his exceptions so that they may not be misunderstood if he expects to base any rights upon them. It is apparent, however, from the statements of the judge in connection with his rulings on these requests that he gave proper weight to the recitals in ancient deeds. He cited, in support of his understanding of the correct rule, *Bridgewater* v. *West Bridgewater*, 7 Pick. 191, *Ward* v. *Oxford*, 8 Pick. 476, and *Sparhawk* v. *Bullard*, 1 Met. 95.

We have examined all the exceptions argued and find no reversible error in the rulings of the judge or in the parts of his decision to which our attention has been drawn. In each case the entry may be

*Exceptions overruled.*