MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2019 ME 151
Docket:        Yor-18-251
Argued:        May 15, 2019
Decided:       October 3, 2019
Revised:       April 9, 2020

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, JABAR, and HUMPHREY, JJ.

ROBERT F. ALMEDER et al.

v.

TOWN OF KENNEBUNKPORT et al.

HUMPHREY, J.

[¶1]  Goose Rocks Beach is a coastal section of Kennebunkport stretching approximately two miles along the Atlantic Ocean and consisting of the beach[1] and upland areas.  Robert F. Almeder and twenty-two other owners of property in this area[2] appeal from a judgment entered by the Superior Court (York County, *Douglas, J.*) after a bench trial determining that the seaward boundary

---

[1] In our case law, "beach" is defined as the land lying between the high and low water marks, *see infra* ¶ 8, and we use the word with that definition in mind.  However, when referring to the general Goose Rocks Beach area, which includes land that is not in dispute, we use the capitalized word "Beach."

[2] This is the second appeal involving these parties regarding the disputed portions of Goose Rocks Beach.  By agreement, the trial court bifurcated the issues, first deciding only claims related to the use of those portions of the Beach, and the parties appealed that decision.  *Almeder v. Town of Kennebunkport*, 2014 ME 139, 106 A.3d 1099 (*Almeder I*).  In *Almeder I*, we referred to Almeder and the other plaintiffs fronting the beach as "the Beachfront Owners," and for clarity we will continue that reference in this decision.

of each of their respective properties does not reach the beach, sometimes referred to as the wet sand, in front of their property, or the dry sand seaward of the "seawall."  In this appeal, which is complicated by a voluminous historical record, we consider whether the Beachfront Owners or the Town of Kennebunkport holds title to the disputed portions of the Beach.

## I.  BACKGROUND

### A.    Procedural History

[¶2]  The ownership of property at Goose Rocks Beach has long been in dispute.  *See Almeder v. Town of Kennebunkport*, 2014 ME 139, 106 A.3d 1099 (*Almeder I)*.  In October 2009, the Beachfront Owners filed a complaint against the Town of Kennebunkport and anyone else who claimed any title or right to use the area of the Beach in front of their properties.  The Beachfront Owners sought a declaratory judgment that each of their parcels includes land to the mean low water mark—subject to the rights of the public to fish, fowl, and navigate in the intertidal zone[3]—and to quiet title to their claimed beach property.  The Town answered and pleaded nine counterclaims, asserting its title to the beach and the dry sand above it, and that it and the public at large have the right to use those areas.

---

[3]  *Infra* ¶ 8.

3

[¶3] From there, the case burgeoned. The State was permitted to intervene as a defendant; in its answer, the State asserted the public's right to use the beach pursuant to the public trust doctrine. Other parties who intervened or attempted to intervene and counterclaim included a group of roughly 200 owners of other property located in the Town's Goose Rocks Beach Zone, not directly on the water (the Backlot Owners); the Surfrider Foundation, a nonprofit organization whose members use the beach; and several members of the general public who claimed frequent use of the beach. The parties then began a period of significant motion practice consisting of dozens of competing motions to dismiss and for summary judgment, culminating in several partial dismissals and summary judgments. By agreement, the court scheduled a bifurcated trial on the remaining claims in which the court would first address only the use-related claims, and then any claims related to deeds or title.

[¶4] In August and September 2012, the court (York County, *Brennan, J.*) conducted a twelve-day bench trial on the use claims—i.e., prescription, custom, and the public trust doctrine—and determined that (1) "the Town, the Backlot Owners, and the public enjoy a public prescriptive easement as well as an easement by custom to engage in general recreational activities on both the wet and dry sand portions of the entire Beach," and (2) "the State had

established, pursuant to the public trust doctrine, that the public's right to fish, fowl, and navigate included the right to cross the intertidal zone of the Beach to engage in ocean-based activities." *Almeder I*, 2014 ME 139, ¶ 12, 106 A.3d 1099 (quotation marks omitted)*.* The Beachfront Owners timely appealed.

[¶5] We vacated the judgment and remanded the matter for the Superior Court to "conduct proceedings and issue a decision on the remaining pending causes of action that were the subject of the second portion of the bifurcated trial," and, if the Town so elects, to "determine the boundaries of each specific Beachfront Owner's parcel [and] reanalyze the evidence already in the record on a parcel-by-parcel basis to determine if the Town met its burden of establishing the elements of a public prescriptive easement as to each particular parcel." *Id.* ¶ 37.

[¶6] In November and December 2016, the Superior Court held an eleven-day bench trial on the parties' title claims at which experts for both the Beachfront Owners and the Town testified and the parties presented nearly 700 exhibits.[4] By judgment dated April 6, 2018, the court (York County,

---

[4] Consideration of the remaining use-based claims—the Town's counterclaims for adverse possession, acquiescence, prescription, dedication and acceptance, public easement, and implied quasi-easement—was deferred by agreement. These claims were ultimately mooted by the court's determination that the Town established title to the beach and portions of the dry sand landward of the beach.

*Douglas, J.*) determined that only one Beachfront Owner (Temerlin) established title to a portion of the beach, and concluded that the Town holds title—derived from the original Town proprietors' ownership of common land[5]—to the dry sand and beach in front of the remaining twenty-two properties in dispute. The Beachfront Owners timely appealed.[6]

B.     Factual Findings

[¶7]   The court made the following findings, which are supported by competent record evidence.

---

[5] The proprietors were

> the original grantees or purchasers of a tract of land, usually a township, which they and their heirs, assigns, or successors, together with those whom they chose to admit to their number, held in common ownership. They enjoyed the absolute ownership and exclusive control over such tract or tracts of land granted to them and were responsible collectively for the improvement of the new plantation. More specifically, they were responsible for inducing and enlisting settlers and new comers, for locating home lots and dwelling houses, for building highways and streets . . . . In other words, they constituted the nucleus of the newly settled community and at first they controlled the whole machinery of the town's life, both political and economic.

*Eaton v. Town of Wells*, 2000 ME 176, ¶ 15, 760 A.2d 232 (quoting Roy H. Akagi, Ph.D., The Town Proprietors of the New England Colonies at 3 (1924)). *See also Green v. Putnam*, 62 Mass. (8 Cush.) 21, 25 (1851) ("In the early period of our colonial history, large tracts of land . . . were from time to time granted by the provincial government to individuals, constituting a *proprietary*, who organized themselves under the colonial laws, kept records of their proceedings, managed and divided their property, and disposed of it by votes of a majority duly recorded on their books of record.").

[6] The Temerlin property is not at issue in this appeal. The court concluded that the Temerlins established title to the beach in front of their property, and the Town does not appeal this ruling.

### 1. Physical Features of the Disputed Area of the Beach

[¶8] The disputed area in this case consists of the intertidal zone and upland areas on the seaward side of the Beachfront Owners' properties. Before unpeeling the complex layers of this appeal any further, an understanding of the following features of the Beach may provide some clarity to the discussion:

- "beach" and "shore." These terms are treated synonymously and refer to the "land lying between the lines of the high water and low water over which the tide ebbs and flows."[7] *Hodge v. Boothby*, 48 Me. 68, 71 (1861) (defining beach); *see also Hodgdon v. Campbell*, 411 A.2d 667, 672 (Me. 1980) (defining shore as "the ground between the ordinary high and low water mark") (quotation marks omitted). The "beach," "shore," and "intertidal zone," defined below, all have their landward boundary at the high water line. However, unlike the "intertidal zone," the most seaward boundary of the beach is the mean low watermark; it does not include the alternative "100 rods" measurement element of the intertidal zone.

- "intertidal zone," also known as "wet sand." As the name suggests, the intertidal zone consists of the shore and flats affected by tides, and thus includes all of the area "between the mean high watermark and either 100 rods seaward from the high watermark or the mean low watermark, whichever is closer to the mean high watermark." *Flaherty v. Muther*, 2011 ME 32, ¶ 1 n.2, 17 A.3d 640 (quotation marks omitted); *see also McGarvey v. Whittredge*, 2011 ME 97, ¶ 13, 28 A.3d 620; *Littlefield v. Maxwell*, 31 Me. 134, 139 (1850).

- "upland," which may include areas of dry sand, is the land "above the mean high watermark"—that is, landward of the beach. *Flaherty*, 2011 ME 32, ¶ 2 n.3, 17 A.3d 640.

---

[7] This land between the "high water and low water over which the tide ebbs and flows," *Hodge v. Boothby*, 48 Me. 68, 71 (1861), is also often referred to as the tidal flats or wet sand. *See Hodgdon v. Campbell*, 411 A.2d 667, 672 (Me. 1980).

7

- "submerged land." This is land located "below the mean low-water mark." *McGarvey*, 2011 ME 97, ¶ 13, 28 A.3d 620. The dispute in this case does not include submerged land; it is defined here merely to make that fact clear.

[¶9] An additional feature is also important to this discussion. In the Goose Rocks Beach area, landward of the mean high water mark, the land rises in elevation, and then descends to a lower elevation where the Beachfront Owners' residences stand. This feature is a natural seawall that runs along a course that is generally in line with that of the manmade seawalls in many sections of the Beach. The Beach has 110 waterfront lots, twenty-three of which are owned by the Beachfront Owners.

2.    History of Land Transactions in the Kennebunkport Area

[¶10] Original ownership of land in New England derived from royal charters issued by the Crown between 1620 and 1639. In 1639, Charles I issued the Charter of the Province of Maine, which granted to Sir Ferdinando Gorges territory including land from the Piscataqua River "along the sea coast" to the Kennebec river, and inland to a depth of 120 miles (the Gorges Patent). During this period, parcels of land in the Province of Maine were transferred in the form of leases or outright grants to individuals who settled the land. These settlements were organized slowly into individual townships—including the

Town of Cape Porpus, which was incorporated in 1653 under Massachusetts authority.[8]  *See* 3 Mass. Col. Rec. 333-39.

[¶11]  In the mid-seventeenth century, the Massachusetts Bay Colony, acting through the General Court, enacted a series of laws affecting property grants in the colony—including the western portion of Maine to which it had laid claim—and decreed that the inhabitants of towns in this area were free to govern their own affairs and dispose of "common lands" within the towns.  *See, e.g.*, 1 Mass. Col. Rec. 172.   With this authority granted to them by Massachusetts, the early settlers of Cape Porpus collectively governed the settlement and oversaw the grant of unclaimed land within the bounds of the township after its incorporation.  During the early years of the township, public grants of common lands were made by vote at town meetings, which were recorded in the Kennebunkport Clerks' Record.

[¶12]  In the 1670s and 1680s, towns throughout the colony—including Cape Porpus—were abandoned and resettled following King Philip's War.  At the same time, the new monarchy in England was preparing to reassert its claim to the colonial territories.   This led to uncertainty with regard to land ownership and resulted in a 1677 decision in England, which declared the

---

[8]  Cape Porpus was renamed Arundel in 1719 and later became the Town of Kennebunkport.

9

Gorges Patent to be the sole, legitimate claim to the Province of Maine and reaffirmed the claims of the successors-in-interest to the Gorges Patent. In March 1678, to reclaim the Province of Maine, Massachusetts orchestrated the purchase of the Gorges Patent through its agent, John Usher, who transferred those rights to the colony. In 1681, to resolve any remaining uncertainty regarding ownership of those lands, Massachusetts appointed Deputy Governor Thomas Danforth, Esq., as President of the Province of Maine and, among other things, authorized him to issue "indentures" to confirm title to lands. 5 Mass. Col. Rec. 309.

[¶13] In 1684, Danforth issued indentures pertaining to land in five towns in the Province of Maine—Cape Porpus, North Yarmouth, Scarborough, Falmouth, and York.[9] Relevant here, the indenture pertaining to the Town of Cape Porpus (the Danforth Deed) provided that Danforth did

> clearly and absolutely *give, grant, and confirm* . . . All that Tract or parcell of Land within the Township of Cape Porpus in said Province according to the Bounds & Limitts of the said Township to them formerly granted by Sir Ferdinando Gorges Knight or by any of his Agents or by the General Assembly of the Massachusetts.

(Emphasis added.) The Danforth Deed named three grantees—John Barret Sr, John Burrington, and John Badson—as "Trustees on the behalf and for the sole

---

[9] These five indentures were identical except with regard to the named grantees and the property described.

use and benefit of the Inhabitants of the Town of Cape Porpus," and included the beach in the area now known as Goose Rocks Beach, which was not previously granted out. There is no evidence that Massachusetts granted out any land in Cape Porpus after the Danforth Deed.

[¶14] Records of land transactions in the years immediately following the Danforth Deed are scarce. To clarify ownership throughout the colony, the General Court established the Eastern Claims process by which inhabitants could register their land claims and confirm their titles; those who failed to do so within the stated time risked losing their claims. In addition, by an Act of 1692-93, the General Court formally granted to Town proprietors the authority to "manage, improve, divide or dispose of" the "undivided and common lands in each Town." Mass. St. 1692-93, c. 28. This confirmed the formal role of the Town proprietary[10] as the entity responsible for granting and confirming tracts of land.

[¶15] In June 1719, Cape Porpus was renamed Arundel. Around this time, the proprietors began to meet formally and conduct business at town meetings. The Clerks' Record during this period reflects two types of meetings: (1) "general," or "legal," town meetings, and (2) meetings of "proprietors,

---

[10] *See supra* note 5.

11

freeholders and inhabitants." In these meetings, the proprietors made grants of common and undivided land in the town and confirmed prior land grants through layouts.[11] The proprietors officially separated their functions from the town in 1726 and began to conduct their own meetings and keep separate records (Proprietors' Record); however, Town officials continued to oversee activities on common lands such as building and repairing public ways and surveying lots.

[¶16] Around 1785, the proprietors still held some undivided common lands in Arundel. Although there is no record reflecting the formal dissolution of the Town proprietary or a final accounting of the lands it granted out or confirmed, there is evidence that the proprietors began to wrap up their affairs around this time. The final entry made by Thomas Perkins, the Clerk for the proprietors, was recorded on April 3, 1790. The next entry in the record is dated six years later and is signed by William Smith, the Clerk of the Town—the Town conducted a meeting on April 4, 1796, to resolve ownership of "the Pines," a portion of the upland sections of the western and middle portions of the Beach that was known by this name.

---

[11] Land relevant to this case was laid out by town lot layers and recorded—e.g., the Downing layout in 1720; the Jeffrey layout in 1727; and the Emmons layout in 1777. Neither the Clerks' Record nor the Proprietors' Record reflects a grant or layout of land referencing or consisting of the beach itself.

3.    Sources of Title to the Beachfront Owners' Properties

[¶17]   Based on geographical location and historical ownership, the Beachfront Owners' properties can be grouped into three sections: the Western Section, the Middle Section, and the Eastern Section.

a.    The Western Section

[¶18]   The Almeder, Coughlin, Celi, GRB Holdings, Flynn, and Cooper properties are within the Western Section of the Beach.  These properties were part of subdivisions created in the early twentieth century by Warren Emmons, Ivory Emmons, and George Piper.  Prior to the twentieth century, this area was sparsely-settled marshland likely held and granted out by the proprietors.

[¶19]  Title to properties in this section of the Beach traces back to land laid out in 1777 to John Emmons based on a 1730 grant to Humphrey Dearing and/or land held by Eliakim Emmons.  This layout was likely based on a grant of common land from the proprietors.  The 1777 layout describes the boundary of the conveyed property as "*[b]eginning at a Pitch Pine Tree . . . then South west . . . then South East* **to the sea wall** *then North East* **by the sea wall** *. . . then Nor West to the Bounds mentioned.*"[12]  This land, on the face of the earth, was located

---

[12]  The original deeds do not use bold or italic font; however, we do so here (as did the trial court) for emphasis.

between the marshes and the beach. Through a series of deeds, the land was transferred and subdivided until it came into its present-day ownership.

b. The Middle Section

[¶20] The Gerrish, Vandervoorn, Gray, Rice, and O'Connor/Leahey properties are situated in the Middle Section of the Beach. This section was primarily marshland and pine groves—the Pines—with a large open area towards the eastern side known as "the opening." The dry sand portion of this section is narrow and the high water line is closest to the upland lots in this section of the Beach. The properties in this section were originally part of land owned and subdivided by Mary (Littlefield) Potter in the late nineteenth century. The parties dispute the chain of title prior to this subdivision; regardless, on April 5, 1881, the land was transferred to Mary Potter. This deed conveying land, including the "piece of Marsh" known as the "Beach Lot," described the parcel as follows:

> One lot situate[d] near Goose Rocks in said Kennebunkport and being a part of the tract known as the pines . . . *Beginning at John Emmon's corner and **running thence to and including the sea wall, and thence by the sea-wall** to land of Owen Burnham* . . . .

This lot was between the marsh road and the natural seawall. Mary Potter then conveyed portions of this land in 1881 and 1882 before she subdivided and

conveyed the remaining land, which was eventually transferred to the present-day owners.

c.      The Eastern Section

[¶21]  The Zagoren, Gallant, Hastings, Sherman/Kinney, Forrest/Julian, Raines, Josselyn-Rose, Sandifer, Lencki, Scribner, Asplundh, and Temerlin properties are located along the eastern half of the Beach.  All of these properties, except the Temerlin property, were part of the land of George Jeffrey, acquired in the mid-seventeenth century.  Eight of the properties derive from a portion of Jeffrey's land acquired and subdivided by Benjamin Fuller and Orlando Dow (Fuller/Dow) in the late nineteenth century.  The oldest known deed to this land, from 1648, described the property as follows:

> to begine at the south west side of the little River betwixt Cape Porpus, & Saco; & ye easternmost River towards Saco to begine at ***the poynt of the groave of pine trees neare unto ye sea & adjoyning unto the sd River, & from thence to runne upon a streight line to the sea banke*** southwest, & from thence southwest towards Cape porpus . . . .

As in other sections of the Beach, the Eastern Section has a natural seawall separating the upland from the beach above the high water line.

4.      The Court's Conclusions

[¶22]  After reviewing each of the Beachfront Owners' twenty-three properties, the court concluded that all but one (Temerlin) failed to establish

title to the beach. The court determined that the seaward boundary of these twenty-two properties was the seawall, a natural and/or manmade feature landward of the intertidal zone of the Beach. It finally concluded that the Town had established title to the land "extending seaward from the seawall or seawall vegetation line to the mean low water mark of the Atlantic Ocean," and that the Town's ownership stems from the proprietors' interest in the common lands—including the beach—which passed to the Town "by operation of law" when the proprietors ceased operations without granting the property to any other owner.

## II. DISCUSSION

[¶23] On appeal, the Beachfront Owners argue that the court erred in relying on the testimony of the Town's expert surveyor and in determining that the Town holds title to the intertidal zone and a portion of the adjacent upland of Goose Rocks Beach.

A. Expert Testimony

[¶24] The Beachfront Owners challenge the relevance and reliability of the testimony of the Town's expert, a surveyor. They argue that it was clear error for the court to rely on the surveyor's testimony because he testified about matters beyond the scope of his expertise, used an unsupportable and

unreliable methodology to identify the seawall, and reached conclusions regarding the location of the seawall that were inconsistent with the understanding and intent of the original property owners who executed the deeds using that term. "We review a court's foundational finding that expert testimony is sufficiently reliable for clear error." *See State v. Maine*, 2017 ME 25, ¶ 16, 155 A.3d 871 (quotation marks omitted).

[¶25] In this case, there is no doubt that the surveyor's testimony was relevant. He testified extensively about the layout of Goose Rocks Beach, the deeds and other documents specific to the Beachfront Owners' properties, and the location of the specified boundaries on the face of the earth. This testimony clearly satisfies the standards of M.R. Evid. 401. Furthermore, the court's conclusion that the surveyor was qualified to testify as an expert and give his opinion—regarding matters other than legal conclusions—is well supported by the record: he has been licensed in Maine since 1986; has expertise surveying and consulting as a boundary expert with a focus on water boundaries; has conducted lectures and presentations on such topics; has experience working with and producing historical maps; and has received national recognition for his work. *See* M.R. Evid. 702. Moreover, the surveyor's testimony and the exhibits he produced were based on his years of experience and the techniques

common to his profession that he applied to the specific facts of this case. *See Searles v. Fleetwood Homes of Pa., Inc.*, 2005 ME 94, ¶¶ 23, 28, 878 A.2d 509. Therefore, the court did not err in relying on the testimony of the Town's expert. *Id.* ¶ 29; M.R. Evid. 702.

B.     The Beachfront Owners' Title Claims

[¶26]  The Beachfront Owners argue that the court erred in concluding that they did not establish title to the beach in front of their residences.  In particular, they assert that the court (1) ignored Law Court precedent concerning the interpretation of ancient deeds and historical records, (2) erred in interpreting the term "seawall," and (3) erroneously concluded that the seawall is the seaward boundary of their properties.  We review de novo "[t]he interpretation of a deed and the intent of the parties who created it, including whether the deed contains an ambiguity." *Sleeper v. Loring*, 2013 ME 112, ¶ 10, 83 A.3d 769.  If language in a deed is ambiguous, a court may "consider extrinsic evidence to determine the intent of the parties," including "the circumstances existing at the time of the making of the deed or the contemporaneous construction of the deed by the grantee or grantor." *Matteson v. Batchelder*, 2011 ME 134, ¶ 16, 32 A.3d 1059 (quotation marks omitted).  In the absence of extrinsic evidence, "the intent of the parties should be ascertained by resort to

the rules of construction of deeds, such as the familiar rule that boundaries are established in descending order of control by monuments, courses, distances and quantity." *Id.* (quotation marks omitted). Finally, we review a court's factual determination of the location of property boundaries on the face of the earth for clear error. *Grondin v. Hanscom*, 2014 ME 148, ¶ 8, 106 A.3d 1150.

### 1. Ancient Deeds and Historical Documents

[¶27] The Beachfront Owners first argue that the court ignored binding precedent regarding the interpretation of ancient deeds and historical records and disregarded longstanding principles forgiving defects in ancient deeds. They argue that the court's approach established an "impossible burden of proof"—which they, and many other property owners in Maine, are unable to meet—and will disrupt the title search process in Maine. In short, the Beachfront Owners argue that the court erred in holding the ancient deeds to modern interpretation standards, thereby disrupting decades of modern ownership.

[¶28] At the heart of this issue is the inherent tension between two principles of deed construction: a grantor may not convey more than what he or she owns, *see Eaton v. Town of Wells*, 2000 ME 176, ¶ 19, 760 A.2d 232, and "much is to be presumed in favor of ancient deeds, if accompanied by

possession," *Hill v. Lord*, 48 Me. 83, 94 (1861). Contrary to the Beachfront Owners' argument, nothing in the court's approach to this case or its articulation of the applicable principles of deed construction misconstrues the law or disrupts the way title searches are conducted in Maine.[13] The court properly understood that the interpretation of a deed is a question of law and that its role was to apply the relevant principles of deed construction and construe the language of the deed to give effect to the expressed intention of the parties. *See Eaton,* 2000 ME 176, ¶ 19, 760 A.2d 232; *McLellan v. McFadden*, 95 A. 1025, 1028 (Me. 1915). Most importantly, the court recognized that an owner of upland oceanfront property presumptively owns to the low water mark when a grant of the property includes a reference or call to the water, *see Commonwealth v. Roxbury*, 75 Mass. (9 Gray) 451, 498 (1857); *Storer v. Freeman*, 6 Mass. 435, 438-39 (1810), and applied this principle to each Beachfront Owners' chain of title. In doing so, the court did not, as the Beachfront Owners argue, resurrect ancient deeds to disrupt modern

---

[13] Although the Beachfront Owners argue that the court should not look past the "resting deed" for each property—the most recent warranty deed to the property recorded at least forty years before the title search or the most recent quitclaim deed recorded at least sixty years before the title search—title standards do not establish ownership; they are simply a benchmark for whether title is marketable. *Dowling v. Salewski*, 2007 ME 78, ¶ 16, 926 A.2d 193.

ownership, but, instead, meticulously reviewed each Beachfront Owner's title chain to determine the boundaries of each property.

2.    Seawall

[¶29]  The Beachfront Owners next argue that the court erred in defining the term "seawall," although the owners differ among themselves on the reasons.  Almeder and the majority of the Beachfront Owners argue that the court erred when it applied a *universal* definition to the term "seawall" and failed to assess each deed's specific language to discern the grantor's intent in using the term.  In contrast, the O'Connor/Leahey owners argue that the term "seawall" has a singular definition that includes "*at least* all the dry sand between the upland running to the mean high-water line or the beach," suggesting that the seaward boundary includes the beach.  (Emphasis added.)

[¶30]  When considering the nature and location of the seawall, the court concluded that "there is no universally accepted legal definition" of the term "seawall," but that the term is "likely used in reference to a corresponding physical feature on the face of the earth that acts as a barrier or wall—either man-made or naturally occurring—that acts to impede the flow of the sea."  The court found that there had been and continues to be such an elevated feature along the length of the upland lots above the high water mark.

21

[¶31]  Although we have had the occasion to define many geographical features of a beach,[14] we have not explicitly defined the term "seawall" and take this opportunity to do so.  As we have previously described, the terms "beach," "shore," and "wet sand," which are treated synonymously, refer to the "land lying between the lines of the high water and low water over which the tide ebbs and flows."  *Hodge*, 48 Me. at 71 (defining beach); *see also Hodgdon*, 411 A.2d at 672 (defining shore as "the ground between the ordinary high and low water mark") (quotation marks omitted).  Landward of the high water mark, there is often a natural and/or manmade embankment.  *See, e.g., Littlefield v. Littlefield*, 28 Me. 180, 186 (1848).  The beach does not include this embankment.  *See Hodge*, 48 Me. at 71; *Littlefield*, 28 Me. at 186-87; *Cutts v. Hussey*, 15 Me. 237, 241 (1839) (land above the high water mark and within the seawall is not the beach).  This embankment is the seawall.  *See Hodge*, 48 Me. at 71; *Littlefield*, 28 Me. at 186; *Cutts*, 15 Me. at 241.

[¶32]  The term "seawall," therefore, refers to an elevated area of land or an embankment situated landward of the beach that, as aptly described by the trial court, is a "physical feature on the face of the earth that acts as a barrier or wall—either man-made or naturally occurring—that acts to impede the flow of

---

[14]  *See supra* ¶ 8.

the sea." The seawall does not extend seaward past the high water mark. Determining the exact location of the seawall on the face of the earth in relation to a parcel of land requires a case-specific inquiry based on the language in individual deeds and the physical features of the land in question.

[¶33] Addressing first O'Connor/Leahey's contention, the court did not err as a matter of law in rejecting their singular definition of seawall—"unless specifically described otherwise in a deed, [the seawall] is *at least* all the dry sand between the upland running to the mean high water line or the beach" (emphasis added), and possibly all or some portion of the beach—which has no basis in our precedent. We have consistently described the seawall as lying somewhere in the area *between* the uplands and the mean high water line (i.e., somewhere on the dry sand), *see Sweeney v. Town of Old Orchard Beach*, 644 A.2d 483, 483 (Me. 1994); *Hodge*, 48 Me. at 71; *Littlefield*, 28 Me. at 186; *Cutts*, 15 Me. at 241, and have not held—and firmly reject—that the seawall *necessarily* includes all of the dry sand or any portion of the intertidal zone.

[¶34] Second, contrary to the argument of Almeder and the other owners, the court did not disregard the specific language of each Beachfront Owner's title chain or apply an erroneous universal definition of "seawall." This argument mischaracterizes the court's analysis. The court searched each title

chain for references to the seawall and then assessed the location of the seawall on the face of the earth by applying our descriptions of the seawall to the specific language of each deed. After reviewing each chain, the court concluded that the Beachfront Owners' titles did not include "land seaward of the [seawall], including without limitation the dry sand portion and intertidal zone of Goose Rocks Beach," *see supra* ¶ 21, and located that seawall boundary landward of the dry sand at either a natural or manmade embankment. Therefore, because the court's interpretation of the term "seawall" accords with the word's use contemporaneous with the drafting of the Beachfront Owners' foundational deeds, reflects our general descriptions of this monument, and is specifically applied to each individual deed, the court did not err in interpreting the term "seawall."

    3.    Seaward Boundaries

[¶35] Finally, the Beachfront Owners argue that the court erred in concluding that the seawall is the seaward boundary of each of their properties. Specifically, they argue that (1) absent clear evidence to the contrary, the beach is conveyed as an "appendance" to the uplands; (2) evidence of several decades of record title to the beach defeats evidence that prior grantors may have intended to exclude the beach, *see generally Dunton v. Parker*, 97 Me. 461,

54 A. 1115 (1903), and (3) the lack of evidence of a separate chain of title to the beach suggests that their properties extend to the low water mark.

[¶36]  The court's determination that the seawall is the seaward boundary of each property was based upon a meticulous review of older deeds and the plans incorporated therein that lay out various parcels.  The court traced the title to each property back to the early 18th century and concluded that the grants in these deeds extended *only* to the seawall and could not be altered by calls to the water included in deeds drafted decades or centuries later.  After reviewing these same deeds, we determine, for two reasons, that the court did not err in concluding, from the deeds, that the seawall is the seaward boundary of each property or, factually, in locating this boundary on the face of the earth.

[¶37]  First, the beach did not pass as an appendance to the upland properties at issue in this case.  As the court correctly summarized, the owner of upland oceanfront property presumptively owns to the low water mark by operation of the Colonial Ordinance of 1641.  *Roxbury*, 75 Mass. (9 Gray) at 498; *Storer*, 6 Mass. at 438-39.  Because the beach may be conveyed separately from the upland, an owner only benefits from this presumption where a grant of property specifically includes a call to the water.  *Storer*, 6 Mass. at 439 ("This

rule applies only in cases where the grantor, seised of the upland and flats, in conveying his land, bounds the land sold on the sea or salt water, or describes other boundaries of equivalent meaning, without any reservation of the flats."). Terms such as "Atlantic Ocean," "ocean," "cove," "sea," or "river" are calls to the water that trigger the presumption, *Bell v. Wells*, 557 A.2d 168, 172 (Me. 1989); *Ogunquit Beach Dist. v. Perkins*, 21 A.2d 660, 663 (Me. 1941). However, language limiting a grant "to" or "by" the shore, beach, bank, or sea shore may defeat the presumption. *See Hodgdon*, 411 A.2d at 672 ("As a monument, the shore limits the grant to the high-water mark."); *Whitmore v. Brown*, 100 Me. 410, 414, 61 A. 985, 987 (1905); *Lapish v. President of Bangor Bank*, 8 Me. 85, 89-90 (1831); *Storer*, 6 Mass. at 438-39.

[¶38]  The court correctly concluded that the Beachfront Owners do not benefit from the Colonial Ordinance presumption because their source deeds do not include a call to the water or even to the shore. As an example, parcels in the Western Section of the Beach trace back to land owned by John Emmons. In a 1777 layout, the land was described as "*Beginning at a Pitch Pine Tree . . . then South East to the* **sea wall** *then North East by the* **sea wall** . . . ."  When this same land was subdivided, each subdivision described the seaward boundary as the seawall or the top of the bank, similarly defeating any presumption that

the upland owners were granted title to the beach. *Storer*, 6 Mass. at 439-40. The foundational deeds and incorporated plans in the other title chains similarly destroy any presumption that the Beachfront Owners own to the low water mark. In most of the title chains, language referencing the water was added to later deeds; these late additions do not resurrect the presumption of ownership to the low water mark. *See Eaton,* 2000 ME 176, ¶ 19, 760 A.2d 232 (noting that "a person can convey only what is conveyed into them").

[¶39] Second, the Beachfront Owners' argument that evidence of several decades of record title to the intertidal zone defeats evidence that prior grantors may have intended to exclude the intertidal zone is unpersuasive. The Beachfront Owners point to our decision in *Dunton v. Parker*, 97 Me. 461, 54 A. 1115 (1903), to support their position. In *Dunton*, we relied on language in later deeds describing the boundaries of a property to conclude that the property owner's land included the "shore." 97 Me. at 465-66, 54 A. at 1117. Although this language did not appear in all of the deeds in the title chain, we concluded that the property extended to and included the shore because early deeds "unquestionably included the shore," and the owners—and their predecessors—maintained "exclusive and uninterrupted possession of the

shore" for nearly three decades. *Id.* at 465, 470, 54 A. at 1117, 1119. *Dunton* is not dispositive in this case.

[¶40] Unlike the property owners in *Dunton*, the Beachfront Owners' chains of title trace back centuries to deeds that *clearly* exclude the beach by referencing the seawall or bank. Moreover, the Beachfront Owners conceded that they have not retained exclusive and uninterrupted possession of the land seaward of the high water mark, and there is no evidence that their predecessors-in-interest ever exclusively used the beach. Therefore, there was no basis on which the court could have concluded that modern deeds in the Beachfront Owners' chains of title overcome the express intent of historical grantors to convey land only to the seawall.

[¶41] Furthermore, the Beachfront Owners' argument that the lack of evidence of a separate chain of title to the intertidal zone suggests that their properties extend to the low water mark is without merit because the specific language in the Beachfront Owners' titles identifies the seaward boundary of each property as the seawall.

[¶42] In sum, the court understood and applied the correct principles of deed construction, navigated the difficulties of piecing together ancient deeds and layouts, considered and ruled out the Colonial Ordinance presumption, and

did not err in interpreting the seaward boundaries of the Beachfront Owners' properties or in locating those boundaries on the face of the earth.

C.    The Town's Title Claims

[¶43]    Finally, the Beachfront Owners argue that the court erred in finding that the Town established title to the disputed portions of the upland and the beach.  They first contend that the Danforth Deed did not vest fee ownership of all land in Kennebunkport in the proprietors.  In the alternative, they argue that any property interest that was conveyed to the proprietors through the Danforth Deed did not vest in the Town by "operation of law" or otherwise.  We agree with the Beachfront Owners, and the court, that the Danforth Deed was not a direct conveyance to the Town in its corporate capacity and, therefore, does not, on its own, give the Town title to the disputed property, including the beach.  We disagree, however, with the Beachfront Owners' argument that the Town does not today own the disputed property and affirm the court's judgment recognizing the Town's claim to the portions of Goose Rocks Beach seaward of the seawall.

1.    Historical Land Ownership

[¶44]  "[F]rom the earliest time[,] towns have been in the habit of holding and disposing of real estate."  *Commonwealth v. Wilder*, 127 Mass. 1, 3

(Mass. 1879). As early as 1636, the Massachusetts General Court empowered towns "to grant land within their limits for public uses, with power by vote to divide them among their inhabitants, subject to the paramount authority of the General Court, which reserved to itself and habitually expressed the power to grant lands so held by a town." *Id.*; *see* 1 Mass. Col. Rec. 172; *Rogers v. Goodwin*, 2 Mass. 475, 477 (Mass. 1807). "Lands within the limits of a town, which had not been granted by the government of the Colony either to the town or to individuals, were not held by the town as its absolute property, as a private person might hold them, but, by virtue of its establishment and existence as a municipal corporation, for public uses." *Lynn v. Nahant*, 113 Mass. 433, 448 (1873). The General Court authorized the freemen of every town "to dispose of their owne lands & woods, with all the privileges & appurtenances of the said townes, to grant lotts, & make such orders as may concern the well ordering of their owne townes" and to choose their own town officers, surveyors and constables, create local laws, and enact penalties for the breach of these orders. *See* 1 Mass. Col. Rec. 172; *Lynn*, 113 Mass. at 448; *Rogers*, 2 Mass. at 477.

[¶45] In an effort to encourage the settlement and population of the colony, Massachusetts also exercised its residual authority to grant land within

townships, *see Lynn*, 113 Mass. at 448, and granted portions of undivided land to groups of individuals (i.e., proprietors).[15]

[¶46]   The proprietary was an entity separate from the Town and authorized by statute in the early 1690s to divide commonly held undivided land.  *See* Mass. St. 1692-93, c. 28; *Green v. Putnam*, 62 Mass. (8 Cush.) 21, 25 (1851).  This statute authorizing the proprietary to "order, improve, or divide" the common and undivided lands in the Town did not itself vest title to such land in the proprietors.  *Id.*  Any ownership or other interest of the proprietors in such land came from other sources, including grants from the Massachusetts General Court, agents of the colony (e.g., Thomas Danforth), or from the towns. The proprietary was a "quasi corporate," but temporary, body that was always "intended to die."  *Bates v. Cohasset*, 182 N.E. 284, 287 (Mass. 1932).  The proprietaries were "formed for the purpose of dividing the common lands and, that having been accomplished, of passing out of existence."  *Id*.  They existed and were created "solely for the convenience of the tenants in common in the management and division of their lands," *id.*, and were extinguished by statute. *See* Mass. St. 1790, c. 40.[16]

---

[15]  *Supra* note 5.

[16]  Mass. St. 1790, c. 40 provides in relevant part,

31

[¶47]  With respect to the Province of Maine specifically, Massachusetts authorized commissions to encourage the settlement of towns in remote areas, resulting in 1653 in the incorporation of the Township of Cape Porpus and several other towns.  *See* 3 Mass. Col. Rec. 338-39.  Massachusetts later authorized Danforth, who had been elected President of the Province of Maine, *see* 5 Mass. Col. Rec. 309, to make large grants of land within the boundaries of these townships on its behalf.  During this period, many colonial towns, although authorized by statute to manage their own affairs, possessed "limited corporate characteristics" and had yet to develop municipal identities separate from the inhabitants who lived within their geographic boarders.  *Bates*, 182 N.E. at 286. Under these historical circumstances, grants to or for the benefit of the inhabitants were common, as was the case with the Danforth Deed in this matter. *See id.*

    2.    The Danforth Deed

---

*And be it further enacted by the authority aforesaid*, that where, after such final division of any lands or other real estate, which have been, or shall have been held as a proprietary, the proprietors making such division have ordered & delivered, or shall order and deliver the record of their proprietary into the custody of the town Clerk, in which such land or other real estate, or part thereof, may lay . . . .

*Provided nevertheless*, that the proprietors aforesaid shall not continue to act in their corporate capacity for more than ten years after the final division of their lands or other real estate . . . .

[¶48]  Because it determined that the language of the Danforth Deed was ambiguous, the trial court relied on extrinsic evidence of the historical context in which the Danforth Deed was drafted to conclude that this document was intended to "confirm the validity of prior grants" made during a period of political instability *and* "enable further grants and confirmations of common and undivided land" within Cape Porpus.  The court further concluded that this indenture was not a grant to the Town itself because it specifically granted the land to three individuals as trustees for the inhabitants of Cape Porpus.  We agree, and explain as follows.

### a.    Nature of the Grant

[¶49]  The plain language of the Danforth Deed provides that Thomas Danforth, "by the Govenour & Company of the Massachusetts Colony," was "fully Authorized & impowered to make Legal confirmation unto the Inhabitants of the above said Province of Mayne and all their Lands or properties to them justly appertaining or belonging within the Limitts or Bounds of the said Province [of Maine]."  Acting on behalf of the Massachusetts Colony, Danforth *fully clearly & absolutely g[a]ve grant[ed] & confirm[ed]"* to "John Barret Sen John Burrington & John Badson Trustees on the Behalf and for the sole use and benefit of the Inhabitants of the Town of Cape Porpus . . . .  All

that Tract or parcell of Land within the Township of Cape Porpus." (Emphasis added.) In so doing, Danforth confirmed land already granted out *and* granted the remaining common and undivided land that had not yet been conveyed. *Cf. Litchfield v. Inhabitants of Scituate*, 136 Mass. 39, 41-43 (1883). However, the Beachfront Owners are correct that this deed was not a conveyance of land at that time to the *Town* outright.

[¶50] The historical context in which the Danforth Deed was drafted, as outlined by the court and supported by competent evidence in the record, supports this interpretation. Throughout the early history of the colony, political turmoil in England coupled with sparse record keeping and the difficulties inherent in establishing early settlements undermined the security of individual titles. *See supra* ¶¶ 12-14. Massachusetts attempted to remedy this uncertainty in part by granting towns the authority to divide and manage their own lands by vote of the freemen, *see* 1 Mass. Col. Rec. 172; *Lynn,* 113 Mass. at 448; *Springfield v. Miller*, 12 Mass. 415, 416 (1815), by commissioning agents to travel to the Province of Maine to encourage the formal incorporation of townships, *see, e.g.*, 3 Mass. Col. Rec. 332-39, and by acquiring the Gorges Patent through its agent John Usher. Massachusetts also confirmed titles and granted common and undivided land through specific acts

of the General Court, the Eastern Claims Process, and grants from agents such as Danforth that resulted in the establishment of proprietaries, as discussed above. *See, e.g.*, 5 Mass. Col. Rec. 9-12.

[¶51] It is clear that, throughout this period, Massachusetts endeavored to settle remote areas of the colony and convey land it had acquired through Usher to individuals and townships. In doing so, it frequently identified individuals or groups of individuals (proprietors) who were responsible for managing and dividing common lands. In light of these circumstances, which are supported by competent evidence in the historical record of this case, the trial court did not err in concluding that the Danforth Deed both confirmed existing ownership and granted common and undivided lands. *Cf. Litchfield*, 136 Mass. at 41-43.

b.      Grant to the Trustees

[¶52] As the court correctly determined, and as the plain language of the deed reflects, Danforth granted legal title to the land in Cape Porpus to three individuals—Barret, Burrington, and Badson—as trustees for the inhabitants of the Town. They were not agents or officials of the Town. Although their interest in the land was unusual by modern standards, grants of this kind—to individuals to hold as tenants in common for the benefit of the inhabitants of a

town, rather than to the town outright—were typical during this era, *see Bates*, 182 N.E. at 286, and are consistent with the historical intent of the Massachusetts Colony to settle the land and transition to the towns and their inhabitants the authority to manage local affairs. Barret, Burrington, and Badson held the common and undivided lands in Cape Porpus not as their absolute property, as a private person might hold them, but "on the [b]ehalf and for the sole use and benefit of the Inhabitants of the Town." These individuals were among the first town proprietors who would later oversee grants of the common and undivided land within Cape Porpus as authorized by statute. Mass. St. 1692-93, c. 28.

3. Transfer to the Town

[¶53] The Beachfront Owners argue that, even if the Danforth Deed effectively granted the common and undivided land in Cape Porpus to Barret, Burrington, and Badson, any interest retained by them did not transfer to the Town. In so arguing, they rely primarily on *Eaton v. Town of Wells*, 2000 ME 176, ¶¶ 17, 26, 760 A.2d 232, to support their contention that the court erred in concluding that title to the beach and dry sand portion of Goose Rocks Beach transferred to the Town in the absence of an express grant. Their reliance on *Eaton* is, however, misplaced.

[¶54]  In *Eaton*, we considered an appeal from a judgment granting the public and the Town of Wells an easement over a portion of Wells Beach. 2000 ME 176, ¶ 1, 760 A.2d 232.  In that case, Wells argued that it held record title to the dry sand and intertidal zone through a grant from Ferdinando Gorges to the original Wells proprietors because, "as the feudal concept of property ownership gave way to fee ownership, this grant of authority . . . had the effect of conveying fee title to the land described to the Town of Wells."  *Id.* ¶ 11 (quotation marks omitted).  In short, Wells argued that the grant to the proprietors was the equivalent of a grant to Wells itself.  *Id.*  We determined that this argument was unpersuasive because (1) there had been no express grant of the disputed land from the proprietors to the Town of Wells and (2) this same land was explicitly and specifically granted to the predecessors-in-interest of the plaintiff property owners.  *Id.* ¶¶ 17, 26.  In contrast, here, the Beachfront Owners cannot show that they hold title to the disputed property because their grants extend only to the seawall.  Moreover, the Town of Kennebunkport, unlike the Town of Wells, does not claim ownership of the disputed areas of Goose Rocks Beach based on the general notion that the transition from a feudal property system to a system of fee

ownership necessarily means that land held by the proprietors was held by the Town.

[¶55] In this case, contrary to the Beachfront Owners' argument, the court did not err in determining that the historical circumstances of this case— specific to the anomalies of the settlement of Cape Porpus—were sufficient evidence of the transfer of title to the Beach in the absence of a specific grant from the proprietors.

[¶56] Barret, Burrington, and Badson, like other colonial proprietors, were empowered by the Massachusetts Colony to "order, improve, or divide" the undivided or common lands in the Town. Mass. St. 1692-93, c. 28. They and other Town proprietors held formal meetings beginning in 1726 and continued in their official capacity until the proprietary dissolved and the proprietors transferred their records to the Town Clerk pursuant to statute. *See* Mass. St. 1790, c. 40. As the trial court found, the record does not contain a specific deed or grant by vote or other means by the proprietors concerning any remaining common land, including the strip of oceanfront property at issue in this case. The proprietors, identified by this time in the records as the "Arundel

Proprietors," simply "pass[ed] out of existence" and relinquished their record book to the Town Clerk. *Bates*, 182 N.E. at 287.[17]

[¶57] In this case, we are reminded once again of the inherent difficulties in tracing title to colonial origins. As the Massachusetts Supreme Judicial Court opined in 1948 when considering similarly complex and voluminous historical records,

> [t]echnical refinements and common law distinctions as to title are not to be given too much weight in determining the origin of the ownership of [land], depending as they do upon events which occurred more than three centuries ago during the incipient and formative stages of a young settlement striving to organize itself into a permanent political subdivision; and whether the ownership was in the town or in its inhabitants, the latter, in those early days, as owners or as freemen, controlled the property, its title and its use. . . . There is great difficulty in applying the strict rules of common law conveyancing, to the early acts and votes of proprietors, towns and parishes, in the colony and province of Massachusetts, without danger of producing some confusion of rights; and the fact probably was, that towns, parishes and proprietors, often consisted so nearly of the same individuals, that a grant or appropriation of one of these bodies to another was little more than an appropriation by themselves in one capacity, to the use of themselves in another; from which it probably followed, that less attention was paid to such acts, than if they had been acts of alienation to strangers.

---

17 Although it is possible that some proprietaries in Maine existed well into the nineteenth and twentieth centuries, *see, e.g.*, R.S. ch. 85 (1840); R.S. ch. 54 §§ 20-30 (1954), the Cape Porpus proprietary dissolved in the late eighteenth century.

39

*Lowell v. Boston*, 322 Mass. 709, 720-21 (1948) (citations and quotation marks omitted).

[¶58] Despite the lack of a specific accounting of the remaining common and undivided land or a grant concerning the same, there is no doubt that the Beachfront Owners in this case have not established ownership of the Beach. It is also clear from the Proprietors' Record and from the deeds in the record of this case that the ownership interest in the disputed beach and dry sand portions of Goose Rocks Beach had not been transferred to any of the Beachfront Owners' predecessors-in-interest. It is equally clear from the record, the historical context, and the early colonial statutes that title to the disputed portions of the Beach was never transferred into any other private hands. Ownership of the Beach passed from the Crown to the colony of Massachusetts; and then from Massachusetts, through Danforth, to the proprietors Barret, Burrington, and Badson, where it was retained in trust by them for the benefit of the Inhabitants of Cape Porpus. The historical record suggests, as the trial court found, that this property remained in trust for the benefit of the Inhabitants of the Town until the proprietary dissolved in the late eighteenth century. *See* Mass. St. 1790, c. 40. The dissolution of the proprietary by statute effectively terminated the trust, its purpose to establish a group of

individuals to settle and organize the Town for the benefit of the Inhabitants having been accomplished. *Id.*

[¶59] Few courts have been tasked, as we are now, with determining who takes title to land once held but never granted out by the proprietors; however, the discussions in cases that have had to consider the question support the Town's claim to the disputed property. *See Lynn*, 113 Mass. at 448 ("The lands within the limits of a town, which had not been granted by the government of the Colony either to the town or to individuals, were not held by the town as its absolute property, as a private person might hold them, but, by virtue of its establishment and existence as a municipal corporation, for public uses, with power by vote of the freemen of the town to divide them among its inhabitants . . . ."); *Bates*, 182 N.E. at 288 (quoting favorably the land court's findings: "If title did remain in the proprietors, then the land not having been set off or granted to any individual, but being held for public purposes, the title would vest in the town by virtue of its establishment and existence as a municipal corporation.") (quotation marks omitted); *Talbot v. Little Compton*, 160 A. 466, 469 (R.I. 1932) (discussing land that was at one point under the jurisdiction of the Plymouth Colony, "If the original proprietors did not allot the land in question, we think it was their intention and the intention of the Colony

that the town should succeed to all their rights therein."); *see also* 3 Tiffany, *Law of Real Property* § 934 (3d ed. 1939) (stating that, as colonial towns developed, common lands not granted out by the proprietary came to be "regarded as the property of the town, rather than that of the proprietors or their descendants").

[¶60]  Therefore, on the record before us, and in the absence of any evidence suggesting that the disputed land was conveyed into private ownership, we affirm the holding of the trial court that in the unique circumstances of this case, legal title to the disputed land seaward of the seawall, including the beach, is held by the Town of Kennebunkport for the benefit of the public.

The entry is:

Judgment affirmed.

---

Sidney St. F. Thaxter, Esq., David P. Silk, Esq., and Benjamin M. Leoni, Esq. (orally), Curtis Thaxter LLC, Portland, for appellants Robert F. Almeder et al.

Gordon R. Smith, Esq. (orally), and Keith E. Glidden, Esq., Verrill Dana, LLP, Portland, and Christopher E. Pazar, Esq., Drummond & Drummond, Portland, for appellants Terrence O'Connor and Joan Leahey

David M. Kallin, Esq. (orally), Melissa A. Hewey, Esq., and Amy K. Tchao, Esq., Drummond Woodsum, Portland, for appellee Town of Kennebunkport

Aaron M. Frey, Attorney General, and Lauren E. Parker, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Gerald F. Petruccelli, Esq., Petruccelli, Martin & Haddow, LLP, Portland, for appellee neighboring landowners

Adam Steinman, Esq., Cape Elizabeth, for appellee Surfrider Foundation

Sandra L. Guay, Esq., Woodman Edmands Danylik Austin Smith & Jacques, P.A., Biddeford, for amicus curiae North American Kelp

David A. Soley, Esq., Glenn Israel, Esq., and James G. Monteleone, Esq., Bernstein Shur, Portland, for amici curiae Susan D. Howe and John D. Howe

Orlando E. Delogu, amicus curiae pro se


York County Superior Court docket number RE-2009-111
FOR CLERK REFERENCE ONLY